United States Court of Appeals,

Fifth Circuit.

No. 95-40803.

TEXAS MANUFACTURED HOUSING ASSOCIATION, INC.;  A.J. Waller, Sr., Plaintiffs-Appellants

v.

NEDERLAND, CITY OF;  Zoning Board of Appeals, City of Nederland, Defendants-Appellees.

Dec. 26, 1996.

Appeals from the United States District Court for the Eastern District of Texas.

Before KING and HIGGINBOTHAM, Circuit Judges, and KAZEN,[*] District Judge.

KING, Circuit Judge:

Plaintiffs appeal a grant of summary judgment in favor of defendants on plaintiffs' multiple claims challenging a city ordinance that regulates the placement of manufactured housing[1] within city limits.  Finding no genuine issues of material fact as to any of plaintiffs' claims, we affirm.

I. BACKGROUND

In 1970, the City of Nederland (t he "City") adopted Ordinance 259, which prohibits the placement of "trailer coaches" on any lot within city limits except in a "duly authorized trailer park." Ordinance 259 defines "trailer coach" as "a transportable, single family dwelling unit which is or may be mounted on wheels suitable for year-round occupancy and containing the same water supply, waste disposal and electrical conveniences as immobile housing."

In 1994, A.J. Waller, Sr. ("Waller") applied to the City for a permit to place a "HUD-code manufactured home" on a lot that he had owned and occupied in Nederland since 1959.  Under Texas law, a "HUD-code manufactured home" has characteristics identical to those of a mobile home except

---

[*]District Judge for the Southern District of Texas, sitting by designation.

[1]In this opinion, the term "manufactured housing" refers collectively to "HUD-code manufactured homes" and "mobile homes," as those terms are defined under Texas law. *See infra* note 2.

1

that a HUD-code manufactured home is built after June 15, 1976, and is constructed according to HUD standards. *See* Tex.Rev.Civ.Stat.Ann. art. 5221f § 3 (Vernon Supp.1997).[2] Waller intended to install the home on a permanent foundation system. The home would have replaced an aging, dilapidated, site-built home that Waller was then occupying.

The City determined that a HUD-code manufactured home was a "trailer coach" and denied Waller's application under Ordinance 259. Waller appealed to the Zoning Board of Appeals of the City of Nederland ("Zoning Board"). After a public hearing, the Zoning Board affirmed the City's denial of Waller's permit application.

The City and the Zoning Board have interpreted Ordinance 259 to include both HUD-code manufactured homes and mobile homes but not "industrialized" or "modular" homes. An

---

[2]The Manufactured Housing Standards Act provides in relevant part:

> Sec. 3. Whenever used in this Act, unless the context otherwise requires, the following words and terms have the following meanings:
>
> (1) "Mobile home" means a structure that was constructed before June 15, 1976, transportable in one or more sections, which, in the traveling mode, is eight body feet or more in width or 40 body feet or more in length, or, when erected on site, is 320 or more square feet, and which is built on a permanent chassis and designed to be used as a dwelling with or without a permanent foundation when connected to the required utilities, and includes the plumbing, heating, air-conditioning, and electrical systems.
>
> (17) "Manufactured housing" or "manufactured home" means a HUD-code manufactured home or a mobile home and collectively means and refers to both.
>
> (19) "HUD-code manufactured home" means a structure, constructed on or after June 15, 1976, according to the rules of the United States Department of Housing and Urban Development, transportable in one or more sections, which, in the traveling mode, is eight body feet or more in width or 40 body feet or more in length, or, when erected on site, is 320 or more square feet, and which is built on a permanent chassis and designed to be used as a dwelling with or without a permanent foundation when connected to the required utilities, and includes the plumbing, heating, air-conditioning, and electrical systems. The term does not include a recreational vehicle as that term is defined by 24 C.F.R. Section 3282.8(g).

Tex.Rev.Civ.Stat.Ann. art. 5221f § 3 (Vernon Supp.1997). These definitions of "mobile home" and "HUD-code manufactured home" track the federal definition of "manufactured home." *See* 42 U.S.C. § 5402(6).

2

"industrialized" or "modular" home is built off-site in modular components that are then transported to a residential site and erected on a permanent foundation.[3] Unlike manufactured housing, modular housing is not built on a permanent chassis and must be constructed according to local building code standards. *See* Tex.Rev.Stat.Ann. art. 5221f-1 § 2 (Vernon 1987). The distinction between manufactured housing and modular housing is at the heart of plaintiffs' constitutional claims.

Waller and the Texas Manufactured Housing Association ("TMHA") (collectively, "plaintiffs") filed suit against the City and Zoning Board on June 29, 1994, challenging the enforcement of Ordinance 259 as discriminatory and unconstitutional. Plaintiffs claimed that defendants' actions amounted to a constitutional tort as well as a denial, under the United States Constitution, of substantive due process, equal protection, just compensation, privileges and immunities, and privacy. Plaintiffs also claimed that enforcement of Ordinance 259 impermissibly burdened interstate commerce and that both federal and state law preempted the subject matter of the ordinance. Plaintiffs sought relief for alleged constitutional violations both directly and under 42 U.S.C. § 1983.

On September 7, 1995, the district court granted summary judgment in favor of defendants on all claims. The district court denied plaintiffs' motion for reconsideration.

On appeal, plaintiffs argue that the district court erred in granting summary judgment for defendants on plaintiffs' preemption, commerce clause, takings, substantive due process, equal

---

[3]"Industrialized housing" is defined under Texas law as:

> a residential structure that is designed for the use and occupancy of one or more families, that is constructed in one or more modules or constructed using one or more modular components built at a location other than the permanent residential site, and that is designed to be used as a permanent residential structure when the modules or modular components are transported to the permanent residential site and are erected or installed on a permanent foundation system.... The term shall not mean nor apply to (i) housing constructed of sectional or panelized systems not utilizing modular components;  or (ii) any ready-built home which is constructed so that the entire living area is contained in a single unit or section at a temporary location for the purpose of selling it and moving it to another location.

Tex.Rev.Civ.Stat.Ann. art. 5221f-1 § 1(1) (Vernon 1987).

3

protection, and § 1983 claims, and in granting defendants' motion to extend time for filing a motion for attorneys' fees.

## II. STANDARD OF REVIEW

We review a grant of summary judgment de novo, applying the same criteria used by the district court in the first instance. *Norman v. Apache Corp.,* 19 F.3d 1017, 1021 (5th Cir.1994); *Conkling v. Turner,* 18 F.3d 1285, 1295 (5th Cir.1994). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). After the movant has presented a properly supported motion for summary judgment, the burden shifts to the nonmoving party to show with "significant probative evidence" that there exists a genuine issue of material fact. *See Conkling,* 18 F.3d at 1295. A fact is "material" if its resolution in favor of one party might affect the outcome of the lawsuit under governing law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). An issue is "genuine" if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party. *Id.*

## III. DISCUSSION

A. *Preemption*

1. *Federal preemption*

The doctrine of federal preemption is rooted in the Supremacy Clause and activated by congressional intent. *See Fidelity Federal Sav. & Loan Ass'n v. de la Cuesta,* 458 U.S. 141, 152-53, 102 S.Ct. 3014, 3022, 73 L.Ed.2d 664 (1982). Congress may either expressly define the extent to which state law is to be preempted by a federal statute, or implicitly preempt state law by regulating comprehensively so as to preclude state law from occupying any part of the regulated field. *Id.* Even where Congress has not entirely regulated a specific area, state law will be nullified to the extent it directly conflicts with federal law or hinders achievement of congressional objectives. *Id.; see also*

4

*Hetzel v. Bethlehem Steel Corp.,* 50 F.3d 360, 363 (5th Cir.1995).

Plaintiffs argue that Ordinance 259 is preempted by the National Manufactured Housing Construction and Safety Standards Act of 1974 (the "Act"), 42 U.S.C. §§ 5401-5426, which expressly prohibits state and local governments from establishing standards for the safety and construction of manufactured homes that differ from federal standards. *See* 42 U.S.C. § 5403(d).[4] Plaintiffs base their argument on isolated portions of testimony of City officials that purportedly establish that a HUD-code manufactured home would not be an acceptable structure on a private residential lot outside a trailer park because such a home would not comply with the "local building code."[5] Plaintiffs contend that this testimony raises a fact issue concerning whether Ordinance 259 imposes local safety and construction standards on HUD-code manufactured homes in contravention of the express will of Congress.

Plaintiffs rely on *Scurlock v. City of Lynn Haven,* 858 F.2d 1521 (11th Cir.1988), in which a permit to place a HUD-code manufactured home in one of the city's residential districts was denied because a local ordinance prohibited the placement in such a district of any home that did not comply with specified local codes. *Id.* at 1522-23. The Eleventh Circuit held that the ordinance was preempted because it attempted to impose greater safety requirements for manufactured homes than those mandated by the federal statute. *Id.* at 1525.

---

[4]This section provides:

> Whenever a Federal manufactured home construction and safety standard established under this chapter is in effect, no State or political subdivision of a State shall have any authority either to establish, or to continue in effect, with respect to any manufactured home covered, any standard regarding construction or safety applicable to the same aspect of performance of such manufactured home which is not identical to the Federal manufactured home construction and safety standard.

42 U.S.C. § 5403(d).

[5]"Local building code" is the term that plaintiffs use in their brief. The depositions relied on by plaintiffs include various references to "local building code," "Standard Building Code," and "Southern Building Code." Plaintiffs do not define these terms. However, because plaintiffs frame their argument using the term "local building code," we use this term in our discussion. We suggest no view as to the distinctions that may or may not exist among the various terms.

5

We agree with the district court that this case is significantly unlike *Scurlock.* The ordinance at issue in *Scurlock* excluded from certain residentially-zoned property any home that either did not meet the Southern Standard Building Code, the National Electrical Code, and the Electrical Code of the City of Lynn Haven, or did not bear the seal of the Florida Department of Community Affairs. As recognized by the Eleventh Circuit, the City of Lynn Haven was "attempting to exclude the Scurlock's mobile home from its R-AA section based *solely* on its safety code." *Id.* (emphasis added). Accordingly, much of the evidence at trial concerned the differences between HUD requirements and those contained in the specified codes. *Id.* at 1523. Ordinance 259, in contrast, regulates the placement and permitting of trailer coaches for the purpose of protecting property values and does not expressly link its provisions in any way to local safety and construction standards.

In *Scurlock,* the evidence showed that a HUD-code home would be permitted in the areas in question as long as it complied with local safety and construction codes (which imposed requirements different from and more stringent than HUD requirements), *irrespective of any other applicable local regulations.* The evidence in this case does not establish this specific, key fact. Plaintiffs have not cited evidence that identifies the actual requirements of the "local building code" that HUD-code manufactured homes fail to satisfy under the ordinance. This omission is fatal to plaintiffs' claim that the ordinance is a thinly veiled attempt to impose local safety and construction standards on HUD-code manufactured homes. The relevant deposition testimony, taken as a whole, does not distinguish between local safety and construction standards and all other aspects of local building regulation (including the ordinance at issue in this case). Therefore it does not create a genuine issue of material fact as to whether enforcement of Ordinance 259 conflicts with federal law. The district court properly granted summary judgment on plaintiffs' federal preemption claim.

2. *State preemption*

Plaintiffs also argue that Ordinance 259 is preempted by the Texas Manufactured Housing Standards Act, Tex.Rev.Civ.Stat.Ann. art. 5221f. This statute specifically allows cities to restrict installation of HUD-code manufactured homes to "areas determined appropriate by the city."

Tex.Rev.Civ.Stat.Ann. art. 5221f § 4A(b) (Vernon Supp.1997). Plaintiffs contend, however, that Ordinance 259 is preempted by section 3A of article 5221f because Ordinance 259 treats the terms "HUD-code manufactured home" and "mobile home" "as functional equivalents under the outdated (1970) rubric of "trailer coach,' " whereas section 3A provides that the terms are mutually exclusive and binding on every political subdivision in Texas.

Plaintiffs are correct that section 3A makes the definitions of manufactured housing contained in article 5221f binding on all local political subdivisions of the state. Section 3A also states that "[a] mobile home is not a HUD-code manufactured home and HUD-code manufactured home is not a mobile home for any purpose under the laws of this state." Tex.Rev.Civ.Stat.Ann. art. 5221f § 3A (Vernon Supp.1997). Nothing in article 5221f, however, precludes a municipality from regulating both types of manufactured housing using a single term such as "trailer coach." Ordinance 259 does not impermissibly regulate either mobile homes or HUD-code manufactured homes, and the district court properly granted summary judgment on the state preemption claim.

B. *Commerce Clause*

The dormant commerce clause confines the states' power to burden interstate commerce. *Oregon Waste Sys., Inc. v. Oregon Dep't Envtl. Quality,* 511 U.S. 93, 114 S.Ct. 1345, 128 L.Ed.2d 13 (1994). The first step in analyzing the constitutionality of legislation under the dormant commerce clause is to determine "whether the challenged statute regulates evenhandedly with only "incidental' effects on interstate commerce, or discriminates against interstate commerce either on its face or in practical effect." *Hughes v. Oklahoma,* 441 U.S. 322, 336, 99 S.Ct. 1727, 1736, 60 L.Ed.2d 250 (1979); *see also Maine v. Taylor,* 477 U.S. 131, 138, 106 S.Ct. 2440, 2447, 91 L.Ed.2d 110 (1986). The Supreme Court has defined "discrimination" in this context to mean "differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Oregon Waste Systems,* 511 U.S. at ----, 114 S.Ct. at 1350. As the Court has alternatively formulated this initial step, "[t]he crucial inquiry ... must be directed to determining whether [the statute] is basically a protectionist measure, or whether it can fairly be viewed as a law directed to legitimate local

7

concerns, with effects upon interstate commerce that are only incidental." *City of Philadelphia v. New Jersey,* 437 U.S. 617, 624, 98 S.Ct. 2531, 2535, 57 L.Ed.2d 475 (1978).

A statute that burdens interstate commerce only incidentally is subject to the flexible balancing approach of *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970), which provides that such a st atute "will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." 397 U.S. at 142, 90 S.Ct. at 847. The *Pike* Court went on to state that "[i]f a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities." *Id.*

Statutes that affirmatively discriminate against interstate commerce are subject to stricter scrutiny. The party challenging the statute bears the initial burden of showing discrimination. *Hughes,* 441 U.S. at 336, 99 S.Ct. at 1736. Once discrimination has been demonstrated, the burden shifts to the state to demonstrate both that the statute serves a legitimate local purpose and that this purpose could not be served as well by available nondiscriminatory means. *Id.*

Plaintiffs argue that the district court erred in applying the balancing test set forth in *Pike* because Ordinance 259 discriminates against interstate commerce in its practical effect and therefore should have triggered strict scrutiny under *Hughes.* Plaintiffs contend that HUD-code manufactured housing is an out-of-state economic interest because many such homes are fabricated outside of Texas and imported into the state, while modular housing is an in-state economic interest because the modular homes that are sold to Texas consumers are constructed in Texas. Plaintiffs offered the affidavit of their expert, Will Ehrle, President and General Counsel of TMHA, who stated that because modular housing must meet the state building code and because of "practicalities of the market," the construction and sale of modular housing is, at least in Texas, a "distinctly local industry." Ehrle further stated that he was not aware of any manufacturer outside of Texas that sells and ships modular homes to Texas. Based o n these facts, Plaintiffs contend that Ordinance 259

8

discriminates against interstate commerce because it prohibits the placement of HUD-code manufactured homes on individual, privately-owned lots in the City while permitting modular homes, which compete in an overlapping market, to be placed on such lots. Plaintiffs argue that an in-state economic interest is thereby benefited while an out-of-state economic interest is burdened.

The facts of this case most closely resemble those of *Minnesota v. Clover Leaf Creamery Co.,* 449 U.S. 456, 101 S.Ct. 715, 66 L.Ed.2d 659 (1981), cited by defendants. In *Clover Leaf,* the Supreme Court upheld a Minnesota statute banning retail sale of milk in plastic nonreturnable, nonrefillable containers, but permitting sale in other nonreturnable, nonrefillable containers, such as paperboard cartons. The purpose of the statute was to promote conservation and ease solid waste management problems. Plaintiff dairy companies argued that the statute impermissibly burdened interstate commerce because the plastic resin used to make the plastic containers was produced entirely by out-of-state firms, while pulpwood, used to make the paperboard milk cartons that would replace the banned plastic containers, was a major in-state product. The statute effectively burdened the non-Minnesota plastic resin manufacturers while providing a boon to the Minnesota pulpwood industry. The Court held, first, that the statute did *not* discriminate against interstate commerce but regulated evenhandedly because it prohibited *all* milk retailers from selling their products in plastic, nonreturnable containers, without regard to whether the milk, the containers, or the sellers were from outside the state. The Court therefore applied the *Pike* balancing test and held, second, that the burden imposed on interstate commerce was relatively minor and not clearly excessive in light of the "substantial" state interest in promoting conservation and easing solid waste disposal problems.[6] 449 U.S. at 472-73, 101 S.Ct. at 728-29.

*Clover Leaf* thus stands for the proposition that the mere fact that a statute has the effect of benefitting a local industry while burdening a separate interstate industry does not in itself establish

---

[6]The Court so held despite state district court findings, based on extensive evidentiary hearings, that the statute would not be able to achieve its stated policy objectives and that the actual basis for the statute was to promote local economic interests in the dairy and pulpwood industries. The Court examined the record and drew contrary conclusions from the evidence.

that the statute is discriminatory. *Clover Leaf* supports defendants' position that Ordinance 259 does not affirmatively discriminate because it treats HUD-code manufactured homes built in state identically to those built out of state.

In another relevant case, *Exxon Corp. v. Governor of Md.,* 437 U.S. 117, 98 S.Ct. 2207, 57 L.Ed.2d 91 (1978), the Court upheld a Maryland statute providing that producers or refiners of petroleum products may not operate any retail service station within the state. The purpose of the statute was to correct inequities in the distribution and pricing of gasoline. Because no producers or refiners operated within the state, the burden of the regulation fell entirely on interstate companies. The Court rejected the argument that this fact established that the statute discriminated against interstate commerce, reasoning that the in-state independent dealers were still subject to competition from out-of-state petroleum marketers that owned and operated retail gas stations but did not produce or refine petroleum and therefore were not bound by the statute. Because the statute did not erect barriers against interstate independent dealers and did not prohibit the flow of interstate goods, place added costs on them, or distinguish between in-state and out-of-companies in the retail sector, the Court held that it had no discriminatory effect. *Id.* at 126, 98 S.Ct. at 2214.

In contrast to the facts of *Clover Leaf* and *Exxon,* in which the benefitted industry did not exist solely within the regulating state, plaintiffs contend that modular housing that could potentially serve the Nederland market originates solely within Texas. Plaintiffs' evidence on this point is limited to the Ehrle affidavit, noted above. Defendants apparently offered no evidence in response. The City's amici, however, note in their brief that the Texas statute regulating modular housing,[7] Tex.Rev.Civ.Stat.Ann. art. 5221f-1 (Vernon Supp.1997), specifically contemplates the interstate sale and installation of modular homes. Section 4(c) of article 5221f-1 expressly permits the state commissioner of licensing and regulation to authorize building inspections of modular housing constructed in another state to be performed by an inspector counterpart in the other state and also to authorize inspections of modular housing that is constructed in Texas for use in another state. This

---

[7]The present statute uses the term "industrialized" for what we refer to as "modular" housing.

provision is not inconsistent with Ehrle's affidavit testimony, which does not foreclose the possibility that modular housing could be constructed out of state and installed in state.[8]

Section 2(a) of article 5221f-1, moreover, requires that modular housing meet the requirements of the National Electrical Code and the requirements of whichever of two specified uniform building codes (the Uniform Building Code and the Standard Building Code) has been adopted by the municipality in which the housing is erected or installed. Section 2(b) provides that if the municipality has not adopted either of the specified codes, or if the housing is created or installed outside a municipality, the housing must be constructed in accordance with whichever of the two codes the manufacturer chooses. These provisions tend to erode plaintiffs' argument that modular housing is a "distinctly local industry" in part because it must conform to a local building code; in this context, the local code must itself conform to certain standards used throughout the nation.

Plaintiffs' attempt to demonstrate that Ordinance 259 has a discriminatory, rather than incidental, effect on interstate commerce is flawed in two respects. First, Ordinance 259 does *not* place any restrictions on out-of-state modular housing, and plaintiffs' evidence, even accepted as true as it must be here, does not show that modular housing is inherently such that it cannot be sold interstate. To the contrary, interstate sale of modular homes was expressly contemplated by the state legislature, and the potential for significant variations among local building codes throughout the state is minimal. Because Ordinance 259 creates no barriers to the free flow of modular homes to and from Texas, the facts of this case mirror those of *Clover Leaf* and *Exxon.*

Second, plaintiffs' own evidence demonstrates that the markets for modular homes and for HUD-code manufactured homes, though overlapping, are basically distinct. Ehrle stated in his affidavit that HUD-code manufactured homes are generally less expensive than modular homes and

_____

[8]We note that the City of Nederland is within close proximity to the Louisiana border and a major interstate highway. Presuming that transportation is a relevant "practicality of the market," it is not at all implausible that modular housing constructed in Louisiana could be transported to Nederland at least as conveniently as modular housing constructed elsewhere in Texas.

represent the only viable option for home ownership for those who cannot afford a modular home. As persuasive as Ehrle's political argument may be to sympathetic policymakers, it precludes a conclusion by this court that, because it will result in a higher proportion of in-state goods than out-of-state goods in the market, it has a discriminatory effect. There are two markets at work, and plaintiffs have not presented evidence demonstrating that a restriction on HUD-code manufactured homes will result in a corresponding increase in sales of modular homes. In other words, plaintiffs have not presented evidence that the two types of housing are substitutes, despite their argument that distinguishing between them for purposes of maintaining property values is irrational and ineffective.

Because Ordinance 259 has only an incidental effect on interstate commerce, the district court was correct to apply the balancing test outlined in *Pike*. Plaintiffs contend that the ordinance fails this test because the burden on interstate commerce is clearly excessive to the local interest served. In support, plaintiffs cite lost sales of HUD-code manufactured homes in the City during the 1991-94 period of over $900,000. Plaintiffs also contend that the City has not demonstrated that preserving property values is a legitimate governmental interest, that the ordinance does not actually achieve the stated objective,[9] and that rather than impose an outright ban on all HUD-code manufactured homes not placed in trailer parks, the City could have adopted the less restrictive alternative of requiring that such homes comply with certain aesthetic requirements.

We conclude that plaintiffs have not produced evidence sufficient to create a genuine issue of material fact with respect to whether the burden on interstate commerce clearly exceeds the local

---

[9]Plaintiffs rely on Ehrle's affidavit testimony that mobile homes have dramatically improved in quality and appearance and that "numerous studies" of the impact of manufactured housing on land values have concluded that property values are not diminished by adjacent HUD-code manufactured housing. It appears, however, that plaintiffs offered no such actual studies. Plaintiffs did produce the report of one appraiser who concluded that the placement of a HUD-code manufactured home on Waller's lot would not adversely affect surrounding property values. The City countered with the affidavit of another appraiser, who stated that the presence of a mobile home or HUD-code manufactured home in a residential neighborhood of conventional site-built homes does have a negative impact on property values. The City's appraiser also stated that Fannie Mae guidelines require that when appraising a conventional site-built home, an appraiser mention in the report the presence of any mobile homes or HUD-code manufactured homes in the neighborhood.

benefits.  It is not evident that plaintiffs have demonstrated a *burden* on interstate commerce at all. The ostensible burden consists of lost sales of HUD-code manufactured homes manufactured by out-of-state firms for placement on individual, privately-owned lots in the City of Nederland.  In-state counterpart firms will suffer proportional losses.  As the Supreme Court stated in *Exxon,* "the [Commerce] Clause protects the interstate *market,* not particular interstate firms, from prohibitive or burdensome regulations."  437 U.S. at 127-28, 98 S.Ct. at 2214-15 (emphasis added).  Plaintiffs have not demonstrated that whatever mode of housing is built in lieu of HUD-code manufactured homes, it will be provided by in-state suppliers.  Because plaintiffs have not raised a genuine issue as to whether any burden the ordinance may impose on interstate commerce is clearly excessive to the local benefits,[10] the district court did not err in granting summary judgment on this claim.

C. *Takings*

The authority of state and local governments to enact land use restrictions has long withstood constitutional scrutiny.  *See Village of Euclid v. Ambler Realty Co.,* 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926).  "Government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law."  *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 413, 43 S.Ct. 158, 159, 67 L.Ed. 322 (1922).  Such authority is not, however, without limits.  Pursuant to the Takings Clause of the Fifth Amendment, made applicable to the states through the Fourteenth Amendment, a land use regulation constitutes a taking if the ordinance "does not substantially advance legitimate state interests ... or denies an owner economically viable use of his land."  *Agins v. City of Tiburon,* 447 U.S. 255, 260, 100 S.Ct. 2138, 2141, 65 L.Ed.2d 106 (1980) (citations omitted);  *see also Dolan v. City of Tigard,* 512 U.S. 374,

---

[10]There can be no dispute that the governmental interest at stake is legitimate.  Maintenance of property values has long been recognized as a legitimate objective of local land use regulation, and the Texas Supreme Court has expressly held that a local ordinance regulating the location of mobile homes is a land use ordinance properly within the local police powers.  *See City of Brookside Village v. Comeau,* 633 S.W.2d 790 (Tex.), *cert. denied,* 459 U.S. 1087, 103 S.Ct. 570, 74 L.Ed.2d 932 (1982).

114 S.Ct. 2309, 129 L.Ed.2d 304 (1994).[11]

In holding that Ordinance 259 does not constitute a compensable taking, the district court reasoned that even if the ordinance precluded the economically optimal use of Waller's land, it neither deprived him of any fundamental attributes of property ownership nor prevented him from making beneficial use of the property. We agree that plaintiffs have not made an evidentiary showing sufficient to create a genuine issue as to the existence of a taking.

Plaintiffs contend that the district court erred in its takings analysis because (1) it improperly "found" that Waller had not been deprived of all economically viable use of his property and (2) it applied the wrong legal standard. Plaintiffs argue that the district court should have applied "heightened scrutiny" under *Nollan v. California Coastal Comm'n,* 483 U.S. 825, 107 S.Ct. 3141, 97 L.Ed.2d 677 (1987), because the City disproportionately singled out Waller. Plaintiffs contend that under *Nollan,* the ordinance cannot stand because it impermissibly attempts to "extract benefits" from the regulation of Waller's land and because it lacks the requisite "closeness of fit" between means and ends. Plaintiffs make no argument and cite no evidence concerning the harm to Waller, other than to state that such harm is "obvious."

The evidence before the court in no way indicates that Waller has been singled out as was the landowner in *Nollan.* Ordinance 259 is a general zoning regulation that applies evenhandedly to entire areas of the City, unlike the challenged requirement in *Nollan* that conditioned a building permit upon the applicant's granting of an uncompensated, permanent, public access easement to the city. *Id.* at 828, 107 S.Ct. at 3143; *see also Dolan,* 512 U.S. at ----, 114 S.Ct. at 2316 (distinguishing *Nollan* and *Dolan* from land use cases in which the regulations involve "essentially legislative determinations classifying entire areas of the city"). The Nederland ordinance does not "extract benefits" from Waller in the *Nollan* sense of requiring some dedication of property to the city.

---

[11]The exception to this formulation is the category of *per se* takings, such as a permanent physical occupation of the property, *Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982), or deprivation of *all* economically beneficial use, *Lucas v. South Carolina Coastal Council,* 505 U.S. 1003, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992). Plaintiffs do not contend that Ordinance 259 constitutes a *per se* taking.

Accordingly, even assuming that *Nollan* establishes a distinct standard in cases of constitutionally suspect conditions, this is not such a case.

We therefore turn to the first question posed under *Agins*—whether Ordinance 259 substantially advances a legitimate state interest. *Agins,* 447 U.S. at 260, 100 S.Ct. at 2141. Ordinance 259 restricts the placement of manufactured housing inside the City's limits to trailer parks in an effort to prevent haphazard placement of such housing throughout the City and thereby prevent a concomitant decline in property values. Conservation of property values is a legitimate governmental interest well within the broad scope of the police power. *See Berman v. Parker,* 348 U.S. 26, 33, 75 S.Ct. 98, 102, 99 L.Ed. 27 (1954); *Corn v. City of Lauderdale Lakes,* 997 F.2d 1369, 1375 (11th Cir.1993), *cert. denied,* --- U.S. ----, 114 S.Ct. 1400, 128 L.Ed.2d 73 (1994). Ordinance 259, moreover, substantially advances this interest. Here, the City determined that manufactured housing would detrimentally affect property values if scattered throughout a municipality. Restricting manufactured housing to trailer parks directly responds to this legitimate concern.

We must now determine whether enforcement of the ordinance interferes with Waller's reasonable use of his property to such a degree as to constitute a taking. This is necessarily a fact-intensive, case-by-case inquiry that takes account of such relevant factors as the extent to which the regulation frustrates distinct investment-backed expectations and whether it completely denies all beneficial use of some portion of the property. *Penn Central Transp. Co. v. City of New York,* 438 U.S. 104, 124-28, 98 S.Ct. 2646, 2659-61, 57 L.Ed.2d 631 (1978). In many contexts, some adverse effect on economic value will be tolerated in the interest of promoting the health, safety, welfare, or morals of a community. *Id.* In this case, plaintiffs have made no showing of harm sufficient to declare enforcement of Ordinance 259 a taking. Plaintiffs have alleged neither physical invasion nor interference with distinct investment-backed expectations, and the evidence fails to show not only a deprivation of all beneficial use of any part of Waller's property, but also any diminution in the property's value. Summary judgment was therefore appropriate on this claim.

15

D. *Substantive Due Process*

The relevant inquiry for plaintiffs' substantive due process challenge is whether there existed a rational basis for the City's enactment and enforcement of Ordinance 259. *Shelton v. City of College Station,* 780 F.2d 475, 482 (5th Cir.) (en banc) ("We hold that the outside limit upon a state's exercise of its police power and zoning decisions is that they must have a rational basis."), *cert. denied,* 477 U.S. 905, 106 S.Ct. 3276, 91 L.Ed.2d 566, *and cert. denied,* 479 U.S. 822, 107 S.Ct. 89, 93 L.Ed.2d 41 (1986). An attack against a zoning decision can succeed only with a showing " "that the legislative facts on which the classification is apparently based could not reasonably be conceived to be true by the governmental decisionmaker.' " *Id.* at 479 (quoting *Vance v. Bradley,* 440 U.S. 93, 110-11, 99 S.Ct. 939, 949-50, 59 L.Ed.2d 171 (1979)). Plaintiffs concede that the exercise of the police power does not offend due process unless the challenged legislation is "clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare." *Euclid,* 272 U.S. at 395, 47 S.Ct. at 121. Plaintiffs nevertheless contend that the purported rational basis for enacting Ordinance 259 is merely a pretext to mask arbitrary and capricious action that renders the Ordinance unconstitutional. Because it is "at least debatable" whether restricting the placement of mobile homes effectively maintains property values, the district court properly granted summary judgment on this claim. *See Shelton,* 780 F.2d at 483; *Clover Leaf,* 449 U.S. at 464, 101 S.Ct. at 723.

E. *Equal Protection*

Plaintiffs argue that the district court erred in applying the rational basis test to their equal protection claim. Relying on *City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 459-460, 105 S.Ct. 3249, 3264-65, 87 L.Ed.2d 313 (1985) (Marshall, J., concurring in part and dissenting in part), plaintiffs propose that a higher standard of review is appropriate whenever noneconomic or noncommercial legislation affects rights of weighty societal importance. Short of suggesting that housing is a fundamental right, plaintiffs contend that heightened scrutiny is appropriate in this case because property rights are at stake.

16

We decline to expand the established parameters of heightened scrutiny. Because this case does not involve a suspect or quasi-suspect classification such as race or sex to which heightened scrutiny properly applies, the Equal Protection Clause requires only rationality review.

Rationality review in this context requires merely that the classification drawn by the statute be rationally related to a legitimate state interest. *Schweiker v. Wilson,* 450 U.S. 221, 230, 101 S.Ct. 1074, 1080, 67 L.Ed.2d 186 (1981). The distinction made by Ordinance 259 between trailer coaches and other forms of housing meets this test. The district court did not err in granting summary judgment to defendants on this claim.

F. *42 U.S.C. § 1983*

Section 1983 affords a private cause of action to any party deprived of a constitutional right under color of state law. *See* 42 U.S.C. § 1983. Plaintiffs contend that the district court erred in dismissing their claims under § 1983 pursuant to its grant of summary judgment on all other claims. Having concluded that the district court did not err in granting summary judgment on plaintiffs' constitutional claims, we hold that its dismissal of claims under § 1983 was proper.

G. *Motion to Extend Time*

Finally, plaintiffs argue that because defendants did not file their motion to extend the time for filing a motion for attorneys' fees until after the period of time for filing such a motion had already expired, the district court's grant of defendants' motion was improper. Defendants contend that the granting of a motion to extend time for filing a claim for attorneys' fees is within the discretion of the district court and that plaintiffs were not prejudiced by the late filing because plaintiffs did receive notice of the claim in time to appeal.

Rule 54(d)(2)(B) of the Federal Rules of Civil Procedure provides that "[u]nless otherwise provided by statute or order of the court, the motion [for attorneys' fees] must be filed and served no later than 14 days after entry of judgment." Rule 6 provides that the district court for cause shown may, in its discretion, grant an extension after the expiration of a specified time period if the failure to timely file was the result of excusable neglect. The record in this case discloses no evidence of

17

abuse of discretion.

## IV. CONCLUSION

For the foregoing reasons, the judgment of the district court is AFFIRMED.

.  .  .  .  .


.  .  .  .  .