**UNITED STATES of America, Plaintiff,**

v.

**Ekpin Udom EKPIN, Defendant.**

**No. CIV.A. H–01–2140.**

United States District Court,
S.D. Texas,
Houston Division.

June 24, 2002.

---

708

Howard Edward Rose, U.S. Atty's Office, Angela A Crider, U.S. Dept of Justice, Civil Div., Houston, TX, for United States of America.

Ekpin Udom Ekpin, Jordan Unit, Pampa, TX, Pro se.

### MEMORANDUM AND ORDER

ATLAS, District Judge.

This action to revoke, set aside, and cancel Defendant Ekpin Udom Ekpin's naturalized citizenship is before the Court on Plaintiff's Motion for Summary Judgment. [Doc. # 19]. Defendant responded to the Government's motion by letter dated May 10, 2002. [Doc. # 20]. The United States has filed a reply. [Doc. # 23]. Having considered the parties submissions, all matters of record, and applicable legal authorities, the Court concludes that the Plaintiff's Motion for Summary Judgment should be **granted.**

### I. UNDISPUTED BACKGROUND FACTS

Defendant is a native of Nigeria. He is married and has five children. In February, 1995, one of Defendant's children, a daughter named Inemesit and nicknamed Joy, confided in a school counselor that Defendant had been sexually abusing her since she was about four years old and that the most recent incident occurred in early March, 1994, when Inemesit was thirteen.[1] The school counselor reported the allegations to Children's Protective Services ("CPS"). Defendant does not dispute Inemesit's version of events,[2] and in fact, during his initial interview with CPS case worker Matthew Broussard in February 1995, admitted to sexually abusing her. Declaration of Matthew Broussard, ¶ 3, Exhibit 21 to Plaintiff's Motion for Summary Judgment; see also Children's Pro-

---

1. The March 1994 incident occurred one afternoon when Defendant called Inemesit into his bedroom and ordered her to take off her clothes. When she refused, Defendant threatened to beat her with a black rod. Defendant was naked. After Inemesit complied with Defendant's demand, Defendant inserted his finger into her vagina, sucked her breasts, and hugged her close so that his penis touched her vagina. Defendant cried during the incident and Defendant told her not to tell anyone what happened. Declaration of Inemesit Ekpin, ¶ 4, Exhibit 16 to Plaintiff's Motion for Summary Judgment.

2. Inemesit also testified that in 1983 or 1984, when she was three or four years old, her father touched her vagina and forced her to play with his penis and kiss him. She further testified that in approximately 1988, when she was eight years old, Defendant came to her while she was sleeping and placed his penis in her vagina and moved it back and forth. He then wiped her off with a washcloth. Declaration of Inemesit Ekpin, ¶¶ 2–3. Neither of these occurrences resulted in criminal charges against Defendant.

tective Services Summary Recording Format, dated March 3, 1995, at 2, Exhibit 9 to Plaintiff's Motion for Summary Judgment. CPS removed Inemesit from the family home on February 10, 1995. Mr. Broussard informed Defendant that CPS policy required him to move out of the home and to undergo therapy. It was Mr. Broussard's practice to end an interview with a sexual abuser, such as Defendant, by stating that a police officer would be contacting the perpetrator regarding a criminal investigation. Declaration of Matthew Broussard, ¶ 4.

On February 13, 1995, Defendant appeared at an emergency hearing in the 315th District Court of Harris County, Texas, at which time he reported his new address as 6023 Dashwood, #198, Houston, Texas, 77081. Defendant also appeared at a hearing on February 23, 1995, at which time the court appointed CPS temporary managing conservator of Inemesit. Temporary Conservatorship Order, Exhibit 5 to Plaintiff's Motion for Summary Judgment.

There is no dispute that Defendant's actions in March, 1994, constitute the offense of aggravated sexual assault of a child in violation of § 22.021 of the Texas Penal Code. Officer Drehel of the Houston Police Department called the family's residence at 13206 Campeachy Circle, in Houston, on February 17, 1995, but got no answer. He also called Mrs. Ekpin's beeper on that date. On February 20, 1995, Officer Drehel called the residence again and left a message for Mrs. Ekpin with Defendant's oldest son. Mrs. Ekpin called Officer Drehel on April 8, 1995, and told him "they" did not want to press charges.

Officer Drehel informed her that a criminal investigation was being conducted. Houston Police Department Current Information Report, dated February 14, 1995, Exhibit 8 to Plaintiff's Motion for Summary Judgment. Defendant was arrested on May 7, 1995. Defendant claims that he was not aware of any criminal investigation prior to his arrest. Defendant pled *nolo contendere* to the charge of aggravated sexual assault of a child and in April, 1996, was sentenced to eighteen years in prison. *See* Exhibit 20 to Plaintiff's Motion for Summary Judgment.

Meanwhile, in September, 1994, Defendant filed an Application for Naturalization, Form N–400, with the Immigration and Naturalization Service ("INS"). On that application, Defendant listed his current address as 13206 Campeachy Circle. Defendant answered "no" in response to the question, "Have you ever knowingly committed any crime for which you have not been arrested?" Defendant did disclose on his Form N–400 his 1989 arrest for assaulting his wife.[3] In the section asking for information about his children, Defendant wrote that each of his five children, including Inemesit, lives "with me." Form N–400, Exhibit 1 to Plaintiff's Motion for Summary Judgment.

On March 8, 1995, an INS officer interviewed Defendant regarding his naturalization application. Defendant was under oath. During the interview, Defendant did not disclose that he had been forced to move out of the family home due to his admitted sexual abuse of a child, that he had been to court twice, that CPS had been appointed his daughters managing conservator, and that neither he nor Inem-

---

**3.** On July 30, 1989, Defendant was charged with assault-bodily injury in violation of § 22.01 of the Texas Penal Code. Defendant hit his wife in the face causing injuries severe enough that she had to be taken to the hospi-

tal emergency room. Mrs. Ekpin, however, did not want to press charges against Defendant, and the assault-bodily injury charge was dismissed in October, 1989.

esit were residing at the Campeachy address listed on the Form N–400. At the end of the interview, Defendant verified that all of the information contained in his September 1994 application was still true and correct. Declaration of Brenda Mouton–Jordan, Exhibit 15 to Plaintiff's Motion for Summary Judgment. On April 20, 1995, Defendant participated in the formal naturalization ceremony, at which time he again represented that his address was 13206 Campeachy Circle and attested that he had committed no crime since his interview on March 8, 1995.

## II. *SUMMARY JUDGMENT STANDARDS*

Rule 56 mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a sufficient showing of the existence of an element essential to the party's case, and on which that party will bear the burden at trial. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (*en banc*) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

In deciding a motion for summary judgment, the Court must determine whether "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir.1994) (*en banc*); *Bozé v. Branstetter*, 912 F.2d 801, 804 (5th Cir.1990). Material facts are those facts "that might affect the outcome of the suit under the governing law." *Smith v. Brenoettsy*, 158 F.3d 908, 911 (5th Cir.1998) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). The facts are to be reviewed with all "justifiable inferences" drawn in favor of the party opposing the motion. *Morris v. Covan Worldwide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir.1998) (citing *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505). However, factual controversies are resolved in favor of the nonmovant "only when there is an actual controversy—that is, when both parties have submitted evidence of contradictory facts." *Laughlin v. Olszewski*, 102 F.3d 190, 193 (5th Cir.1996).

The party moving for summary judgment has the initial burden of demonstrating the absence of a material fact issue with respect to those issues on which the movant bears the burden of proof at trial. The movant meets this initial burden by showing that the "evidence in the record would not permit the nonmovant to carry its burden of proof at trial." *Smith*, 158 F.3d at 911. The burden then shifts to the nonmovant to demonstrate that summary judgment is inappropriate. *Morris*, 144 F.3d at 380. This is accomplished by producing "significant probative evidence" that there is an issue of material fact so as to warrant a trial. *Texas Manufactured Housing Ass'n v. Nederland*, 101 F.3d 1095, 1099 (5th Cir.1996); *Taylor v. Principal Financial Group, Inc.*, 93 F.3d 155, 161 (5th Cir.1996); *Transamerica Ins. Co. v. Avenell*, 66 F.3d 715, 718–19 (5th Cir. 1995); *Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir.1994). The evidence must be "sufficient to support a jury verdict." *Morris*, 144 F.3d at 380; *accord, Doe v. Dallas Indep. School Dist.*, 153 F.3d 211, 215 (5th Cir.1998).

The nonmovant's burden is not met by mere reliance on the allegations or denials in the nonmovant's pleadings. *E.g., Morris*, 144 F.3d at 380. Likewise, "unsubstantiated or conclusory assertions that a

fact issue exists" do not meet this burden. *Id.* Instead, the nonmoving party must present specific facts which show "the existence of a 'genuine' issue concerning every essential component of its case." *Id.* A dispute about a material fact is genuine only if evidence is such that reasonable jury could return a verdict for nonmoving party. *Stafford v. True Temper Sports,* 123 F.3d 291, 294 (5th Cir.1997); *Hanks v. Transcontinental Gas Pipe Line Corp.,* 953 F.2d 996, 997 (5th Cir.1992). In the absence of any proof, the court will not assume that the nonmovant could or would prove the necessary facts. *McCallum Highlands, Ltd. v. Washington Capital Dus, Inc.,* 66 F.3d 89, 92 (5th Cir.1995), *revised on other grounds upon denial of reh'g,* 70 F.3d 26 (5th Cir.1995); *Little,* 37 F.3d at 1075 (citing *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 888, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990)).

### III. *ANALYSIS*

#### 1. *Legal Standards for Revocation*

This denaturalization proceeding presents important issues for Defendant and the Government. *See Fedorenko v. United States,* 449 U.S. 490, 507, 101 S.Ct. 737, 66 L.Ed.2d 686 (1981). The Supreme Court has recognized that the right to acquire United States citizenship is a precious one and that once acquired, its loss can have severe and unsettling consequences. *Id.* at 505, 101 S.Ct. 737. At the same time, the Supreme Court has also recognized that there must be strict compliance with all congressionally imposed prerequisites to the acquisition of citizenship, and that failure to comply with any such prerequisites renders the certificate "illegally procured" and subject to being set aside. *Id.* at 506, 101 S.Ct. 737. The judicial insistence on strict compliance with statutory conditions is an acknowledgment of the fact that Congress alone had the constitutional authority to prescribe rules for naturalization, and the courts' task is to ensure compliance with the prerequisites to naturalization to "safeguard the integrity of this priceless treasure." *Id.* at 506–07, 101 S.Ct. 737.

■ To prevail in a proceeding to revoke naturalization, the Government must prove its case by clear, convincing, and unequivocal evidence, and leave no issue in doubt. *Fedorenko v. United States,* 449 U.S. 490, 506, 101 S.Ct. 737, 66 L.Ed.2d 686 (1981). Section 340(a) of the Immigration and Naturalization Act provides in relevant part:

> It shall be the duty of the United States attorneys for the respective districts, upon affidavit showing good cause therefor, to institute proceedings in any district court of the United States in the judicial district in which the naturalized citizen may reside at the time of bringing suit, for the purpose of revoking and setting aside the order admitting such person to citizenship and canceling the certificate of naturalization on the ground that such order and certificate of naturalization *were illegally procured or were procured by concealment of a material fact or by willful misrepresentation.*

8 U.S.C. § 1451(a) (emphasis added).

■ Naturalization is "illegally procured" when the individual was statutorily ineligible for naturalization. *Fedorenko,* 449 U.S. at 506, 101 S.Ct. 737. One statutory requirement of eligibility for naturalization is that the individual be of "good moral character." 8 U.S.C. § 1427(a)(3). The statutory period for which good moral character is required begins five years prior to filing the application for naturalization, and continues until the applicant take the oath and becomes a United States citizen. *Id.; see also* 8 C.F.R.

§ 316.10(a)(1). However, conduct that occurred prior to the statutory period can be used in determining good moral character during the statutory period if relevant to a determination of present moral character. 8 C.F.R. § 316.10(a)(2). Although immigration laws identify certain characteristics that preclude individuals from establishing good moral character, *see* 8 U.S.C. § 1101(f)(1)-(8), the "fact that any person is not within any of the foregoing classes shall not preclude a finding that for other reasons such person is or was not of good moral character." 8 U.S.C. § 1101(f). Determinations of good moral character must be made "on a case-by-case basis taking into account the elements enumerated in [8 C.F.R. § 316.10] and the standards of the average citizen in the community of residence." 8 C.F.R. § 316.10(a)(2). In addition, an applicant for naturalization lacks good moral character if he admits the commission of one or more crimes involving moral turpitude during the statutory period, even if there was never a formal charge, indictment, arrest, or conviction. 8 C.F.R. § 316.10(b)(2)(iv).

 Naturalization may also be revoked when procured by concealment of facts or misrepresentations "that are both willful and material." 8 U.S.C. § 1451(a); *Kungys v. United States,* 485 U.S. 759, 767, 108 S.Ct. 1537, 99 L.Ed.2d 839 (1988). Denaturalization on such grounds has four independent requirements: (1) the naturalized citizen must have misrepresented or concealed some fact; (2) the misrepresentation or concealment must have been willful; (3) the fact must have been material; and (4) the naturalized citizen must have procured citizenship as a result of the misrepresentation or concealment. *Kungys,* 485 U.S. at 767, 108 S.Ct. 1537. A misrepresentation or concealment is material if it had a natural tendency to influence the decisions of the Immigration and Naturalization Service. *Id.* at 772, 108 S.Ct. 1537. The Government need not prove that "but for" the misrepresentation or concealment the applicant would not have been approved for citizenship. *Id.* at 776–77, 108 S.Ct. 1537. Instead, one who obtained citizenship in a proceeding where he made a material misrepresentation is presumably disqualified and such presumption may be refuted by the applicant only by proof that the applicant in fact met all statutory requirements. *Id.* at 777, 108 S.Ct. 1537.

The Government contends that Defendant's naturalization should be revoked both because it was illegally procured and because it was procured by means of misrepresentations and concealment.

## 2. *Analysis of Grounds for Revoking Defendant's Naturalization*

***Illegal Procurement.***—The Government contends that Defendant lacked the good moral character required for naturalization because he admits to committing acts that constitute aggravated felony crimes, are crimes of moral turpitude, and are not considered moral by the standards of the average citizen in the community. Defendant himself characterizes his wrongdoings as "reprehensible." *Id.* at 5. Defendant nevertheless contends that the attack on his moral character is "nonsense" because "[a]part from crossing the line of my parental care for my precious daughter and my intemperate encounter with my dear wife in 1989, all of which I took and have taken full and complete responsibility, no one can truthfully accuse Ekpin Udom Ekpin of any other unlawful misconduct in all my 25 years of living in America." Defendant's Letter Response, at 3. Defendant's assertions indicate that he fails to appreciate the serious nature of his crimes against his daughter.

■ An individual who has been **convicted** of an aggravated felony is barred from naturalization. 8 U.S.C. § 1101(f)(8); 8 C.F.R. § 316.10(b)(ii). Under United States immigration law, the definition of "aggravated felony" includes sexual abuse of a minor and a crime of violence. 8 U.S.C. § 1101(a)(43)(A) and (F). Defendant's conduct in March 1994 clearly meets this definition of an aggravated felony.[4] However, at the time of his naturalization ceremony in April 1995, Defendant had not yet been **convicted** of any crime. Thus, these provisions of law are not a valid basis to revoke Defendant's naturalization.

■ The Government relies on another provision of the federal immigration regulations. An applicant who **commits** during the statutory period any crime of moral turpitude, for which the applicant is later convicted, is barred from naturalization. 8 C.F.R. § 316.10(b)(2)(i). Defendant **committed** the crime for which he is currently serving an eighteen-year prison term in March 1994, during the statutory period for determining good moral character. Thus, the Government is entitled to judgment revoking Defendant's naturalization if Defendant's aggravated sexual assault of his daughter constitutes a crime of moral turpitude.

Federal immigration law does not define "moral turpitude." Whether a crime involves moral turpitude depends upon the inherent nature of the crime, as defined in the statute concerned, rather than the circumstances surrounding the particular transgression. *Pichardo v. I.N.S.*, 104 F.3d 756, 759 (5th Cir.1997). As described in *Pichardo:*

Moral turpitude refers generally to conduct that shocks the conscience as being inherently base, vile, or depraved, and contrary to the accepted rules of morality and the duties owed between persons or to society in general. Moral turpitude has been defined as an act which is per se morally reprehensible and intrinsically wrong or malum in se, so it is the nature of the act itself and not the statutory prohibition of it which renders a crime one of moral turpitude. Among the tests to determine if a crime involves moral turpitude is whether the act is accompanied by a vicious motive or a corrupt mind.

*Id.* at 760 (quoting *Hamdan v. I.N.S.*, 98 F.3d 183, 186 (5th Cir.1996)); *see also Omagah v. Ashcroft*, 288 F.3d 254, 259–60 (5th Cir.2002) (quoting *Hamdan*, 98 F.3d at 186, and concluding that conspiring to obtain, possess, and use illegal immigration documents involves fraud and is a crime of moral turpitude). In *Pichardo*, the Fifth Circuit ruled that a conviction for involuntary deviate sexual intercourse, indecent assault, endangering the welfare of children, corruption of minors, and incest were "unquestionably" crimes involving moral turpitude. *Id.* at 759. Defendant Ekpin's incestuous sexual abuse of his daughter, which involved digital penetration and sucking her breasts while both were naked and against her will, is unquestionably a crime of moral turpitude.

■ The immigration regulations provide yet another basis on which to revoke Defendant's naturalization. A finding of good moral character is precluded if during the statutory period an applicant **ad-**

---

**4.** *See United States v. Velazquez–Overa*, 100 F.3d 418 (5th Cir.1996) (sexual contact with a child is a crime of violence because there is always a substantial risk that physical force will be used to ensure the child's compliance). In this case, the evidence establishes that in

March 1994, Defendant committed clear sexual abuse of a minor and threatened to beat his daughter with a black rod to get her to comply with his demands. *See* Exhibit 16, ¶ 4.

*mits* committing any aggravated felony as defined by § 1101(a)(43), even though there was never a formal charge, indictment, arrest, or conviction. 8 C.F.R. § 316.10(b)(2)(iv). The uncontroverted evidence establishes that during his February 1995, interview with CPS case worker Broussard, Defendant *admitted* not only the March 1994 incident, which clearly constitutes an aggravated felony under § 1101(a)(43), but also that he had inappropriately touched Inemesit's vagina in the past.[5] *See* Exhibit 9. Such inappropriate touching constitutes sexual abuse of a minor, which is an aggravated felony for purposes of federal immigration law. *See* 8 U.S.C. § 1101(a)(43); *see United States v. Williams*, 120 F.3d 575, 579 (5th Cir. 1997) ("when an older person attempts to sexually touch a child under the age of fourteen, there is always a substantial risk that physical force will be used to ensure the child's compliance.").

In addition, a finding that an individual lacks good moral character may be based on reasons other than those expressly listed in the immigration law and regulations, taking into account the standards of the average citizen in the community of residence. *See* 8 U.S.C. § 1101(f); 8 C.F.R. § 316.10(a)(2). There can be no doubt that the average citizen of Harris County, Texas, would deem immoral Defendant's sexual abuse conduct that began when his daughter was a small child.

■ The Court finds that Defendant has failed to create a genuine issue of material fact as to his good moral character during the statutory period, and that the Government has met its burden to

prove by clear, convincing, and unequivocal evidence that Defendant procured his naturalization by failing to disclose that he had committed acts that were an aggravated felony prior to his naturalization.

*Willful and Material Misrepresentations and Concealment.*—The Government further contends that Defendant procured his naturalization by willful misrepresentation or concealment of material facts. Specifically, the Government contends that Defendant misrepresented the following material facts: that he had not committed a crime for which he had not been arrested, and that there had been no change in his address despite having been forced to move out of his Campeachy Circle home due to allegations of sexual abuse.

■ Defendant contends that he never admitted to committing a "crime" and that he did not know about a criminal investigation prior to his arrest on May 7, 1995, a couple weeks *after* his naturalization ceremony. Defendant further contends that he considers the Campeachy Circle residence his address even to this day, despite the fact that he is incarcerated in Pampa, Texas, and that he therefore answered truthfully when asked on March 8, 1995 if his address had changed since filing his application.

The evidence establishes that Defendant did not reveal during his March 8, 1995, naturalization interview, or at any other time prior to his naturalization ceremony, that his address had changed, that he had admitted sexually abusing Inemesit, that there had been court proceedings in February 1995, related to the sexual abuse,

---

**5.** Defendant's February 1995 admissions of past acts other than those of March 1994, were not specific as to time. However, in Defendant's Statement attached to his Pre–Sentence Investigation completed in March, 1996, Defendant expressly admitted to each of the instances of abuse testified to by Inemesit, although he stated that her first incident occurred when she was six, not four or five as stated by Inemeist. *See* Exhibit A to Exhibit 6 of Plaintiff's Motion for Summary Judgment.

that Inemesit had been placed in the care of CPS, or that he had committed a crime for which he had not been arrested since filing his application. *See* Declaration of Brenda Mouton–Jordan, Exhibit 15 to Plaintiff's Motion for Summary Judgment.

As to his address, Defendant essentially states that he did not think he was answering incorrectly when he said his address had not changed because he has always considered, and still considers, the Campeachy Circle address to be his permanent address. The Form N–400 does not make any distinction between a residence and an address, or between a permanent and temporary address. In this regard, Defendant's explanation is not entirely implausible and does not serve as a viable basis for the relief the Government seeks.

Defendant, however, certainly knew in the March 8, 1995 interview that his change of residence meant that his prior representation that each of his children, including Inemesit, lives "with me" was untrue. This misrepresentation was willful even under the meaning of the word as understood by Defendant, *i.e.* "deliberate; intentional." Defendant's Letter Response, at 3. Under the law, a misrepresentation is willful if it is deliberate and voluntary. *See Witter v. I.N.S.*, 113 F.3d 549, 554 (5th Cir.1997) (interpreting willfulness in context of deportation case). To show willfulness, proof of intent to deceive is not required. Knowledge of the falsity of the representation is sufficient. *Id.* at 554.

Defendant also contends that he did not willfully misrepresent or conceal anything when he answered "no" to the question "have you knowingly committed any crime for which you have not been arrested?" Defendant points out that he admitted sexually abusing his daughter, but did not admit to a "crime." In order for Defendant to establish a legally viable excuse for his failure to reveal his sexual abuse of his daughter in response to this question, Defendant must demonstrate that he did not understand in March 1995 that his sexual abuse acts constituted a crime. Defendant denies that the CPS case worker informed him that there would be a criminal investigation in February 1995, and denies that his wife gave him a message from Officer Drehel in April 1995, prior to the naturalization ceremony.

Defendant's denials must be considered in light of his educational background and work experience as a nurse, counselor, and substitute school teacher. Defendant, in his deposition testimony, establishes that he knew that sexual abuse of a child is a crime in the state of Texas. Defendant specifically testified:

Q. But aside from what you did to your daughter itself, did you know that sexual abuse of children is a crime?

A. From my studies, yeah.

Deposition of Ekpin Udom Ekpin, Exhibit 14 to Plaintiff's Motion for Summary Judgment, at 83. Defendant added:

There was nothing in my mind that spells crime and there was nobody talking crime to me until ***February 10*** when Broussard told me that what I did was that, that I abused my daughter. I accepted it. So there was nothing until then, until that date that Broussard said that to me, and that was it.

*Id.* at 87 (emphasis added). Defendant also testified in February 1995, when Defendant admitted that he sexually abused his daughter, he knew that he was admitting to having committed a crime. Thus, when Defendant denied in March 1995 having committed any crime for which he had not been arrested, he did so falsely, deliberately, and voluntarily, and therefore willfully.

717

The Government must also prove that Defendant's willful misrepresentations and concealment were material. The test for materiality is whether the misrepresentations and concealment had a natural tendency to influence the decisions of the INS. *Kungys,* 485 U.S. at 771–72, 108 S.Ct. 1537. Materiality under 8 U.S.C. § 1451(a) is an issue of law. *Id.* at 772, 108 S.Ct. 1537. The Court concludes that Defendant's misrepresentation that his daughter lived with him, when in fact she had been put in the custody of CPS and Defendant had been ordered to move out of the family home, and Defendant's failure to reveal that he had committed the crime of sexual abuse of a child are material under the *Kungys* standard.

The Government thus has proven by clear and convincing evidence that Defendant was not eligible for naturalization in March 1995 because he had committed a crime of moral turpitude during the statutory period for establishing good moral character, and because Defendant misrepresented and concealed material facts from the INS that would have revealed that he was ineligible. Defendant has not presented any facts that create a genuine disputed issue on these matters. Therefore, the Court concludes that Defendant procured his naturalization by means of misrepresentations and concealment.

## IV. *CONCLUSION AND ORDER*

The Court concludes that Defendant procured his naturalization illegally because he lacked the good moral character required to make him eligible for naturalization. In addition, Defendant procured his naturalization by means of willful material misrepresentations and concealment because he did not reveal during his March 1995 INS interview that he was no longer living at the family residence on Campeachy Circle or that he had committed the crime of sexual abuse of a minor, for which he had not been arrested. It is therefore

**ORDERED** that Plaintiff's Motion for Summary Judgment [Doc. # 19] is **GRANTED.** It is further

**ORDERED** that the April 20, 1995 naturalization of Ekpin Udom Ekpin, ordered by the Attorney General of the United States and admitting Defendant Ekpin to citizenship of the United States is **RE-VOKED and SET ASIDE,** and Certificate of Naturalization No. 21426744 issued by the Attorney General of the United States is **CANCELED.** It is further

**ORDERED** that from the date of entry of this Order, Mr. Ekpin is forever **RE-STRAINED** and **ENJOINED** from claiming the rights, privileges, or advantages of United States citizenship based upon his April 20, 1995 naturalization. It is further

**ORDERED** that Mr. Ekpin shall immediately **SURRENDER and DELIVER** his Certificate of Naturalization, any copies thereof in his possession, and any other indicia of United States citizenship, to the United States Attorney for the Southern District of Texas, as representative of the Attorney General of the United States.

The Clerk of the Court shall deliver a certified copy of this Order to the parties and the Attorney General of the United States, through the United States Attorney for the Southern District of Texas.