**CMH MANUFACTURING, INC., Elixir Industries, Fleetwood Homes of N.C., Inc., and Champion Homes, Inc., Plaintiffs,**

v.

**CATAWBA COUNTY, a county in the State of North Carolina, and the Catawba County Board of Commissioners, Robert E. Hibbitts, David L. Stewart, Marie H. Huffman, W. Steve Ikerd, Gretchen Peed, in their official capacities, Defendants.**

Civil No. 5:96CV90–H.

United States District Court,
W.D. North Carolina,
Statesville Division.

Feb. 11, 1998.

---

698

Hope Derby Carmichael, R. Frank Gray, Jordan, Price, Wall, Gray & Jones, Raleigh, NC, for Plaintiffs.

Robert Oren Eades, Patrick, Harper & Dixon, Hickory, NC, F. Lane Williamson, Womble, Carlyle, Sandridge & Rice, Charlotte, NC, for Defendants.

### *MEMORANDUM OF DECISION AND ORDER*

HORN, Chief United Magistrate Judge.

**THIS CAUSE** was tried before the Court without a jury beginning on January 28, 1998, and concluding on January 29, 1998. The Court has jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. §§ 1331, 1343(a) and 2201, as well as 42 U.S.C. § 5411(a). The parties have consented to magistrate judge jurisdiction under 28 U.S.C. § 636(c). Based upon the evidence offered at trial, the Court finds and holds as follows:

### *I. FINDINGS OF FACT*

1. On March 18, 1996, Catawba County, through its Board of Commissioners, amended the Catawba County Zoning Ordinance, Sections 515.075 and 515.076, relating to double-wide (Class A) and single-wide (Class B) mobile homes,[1] respectively. Plaintiffs chal-

---

**1.** The terms "mobile homes" and "manufactured housing" are essentially synonymous and will be used interchangeably.

lenge, in particular, two provisions in Section 515.076 of the Catawba County Zoning Ordinance relating to single-wide mobile homes. These criteria require exterior siding and roof shingles of a type "commonly used in standard residential construction." Specifically, subparts (A) and (B) of Section 515.076 state as follows:

(A) Exterior finish. The exterior siding shall consist predominantly of vinyl or aluminum lap siding (whose reflectivity does not exceed that of flat white paint), wood or hardboard comparable in composition, appearance and durability to the exterior siding commonly used in standard residential construction.

(B) Roof construction and pitch. The roof shall be designed to have a minimum rise of 2 1/2 feet for each 12 feet of horizontal run and finished with a type of shingle that is commonly used in standard residential construction.

2. Plaintiffs filed the original Complaint on July 18, 1996, and were allowed to file an Amended Complaint by Order dated October 9, 1996. The Amended Complaint alleges: first, that the challenged amendments are preempted by the National Manufactured Housing Construction and Safety Standards Act, 42 U.S.C. § 5401, et seq. (hereafter "the Act"); second, that the amended ordinance constitutes an impermissible burden on interstate commerce in violation of Article I, Section 8 of the United States Constitution; and third, that the ordinance violates the substantive due process and equal protection clauses of the Fifth and Fourteenth Amendments to the United States Constitution. The Amended Complaint seeks a declaratory judgment holding the amended ordinance invalid and unenforceable, injunctive relief prohibiting enforcement of the challenged provisions of the ordinance, and damages and attorneys' fees pursuant to 42 U.S.C. § 1988.

3. By stipulation, the parties agreed that the following issues were for trial before the Court:

(a) Whether the Catawba County zoning ordinance amendments (§§ 515.075 & 515.076) are preempted by the Nation-

al Manufactured Home Construction and Safety Standards Act.

(b) Whether the Catawba County zoning ordinance amendments (§§ 515.075 & 515.076) violate the Commerce Clause of the United States Constitution.

(c) Whether the Catawba County zoning ordinance amendments (§§ 515.075 & 515.076) violate the equal protection and substantive due process guarantees of the Fourteenth Amendment to the United States Constitution.

(d) Whether the Plaintiffs are entitled to recovery of attorneys' fees and costs pursuant to 42 U.S.C. §§ 1983 and 1988.

By further stipulation, the parties agreed that the Plaintiffs would not offer evidence concerning monetary damages, nor seek monetary damages (as separate from costs and attorney's fees) for any of their claims for relief.

4. Plaintiff CMH Manufacturing, Inc. ("CMH") is a Tennessee corporation, with its principal place of business in Knoxville, Tennessee.

5. Plaintiff Elixir Industries ("Elixir") is a California corporation, with its principal place of business in Gardena, California.

6. Plaintiff Fleetwood Homes of N.C., Inc. ("Fleetwood") is a North Carolina corporation with its principal office in Charlotte, North Carolina.

7. Plaintiff Champion Homes, Inc. ("Champion") is a Michigan corporation with its principal place of business in Auburn Hills, Michigan.

8. Defendant Catawba County is one of the 100 counties in the State of North Carolina. It is a body politic and corporation organized and operating under Chapter 153A of the General Statutes of North Carolina.

9. Defendant Catawba County Board of Commissioners is the duly elected board of county commissioners of Catawba County, North Carolina.

10. At all times relevant to the Complaint, Defendant Robert E. Hibbitts was the Chairman of the Catawba County Board of

Commissioners; Defendant David L. Stewart was a duly-elected Commissioner, acting as the Vice–Chairman of the Catawba County Board of Commissioners; and Defendants Marie H. Huffman, W. Steve Ikerd, and Gretchen Peed were duly elected Commissioners, sitting on the Catawba County Board of Commissioners.

11. Plaintiffs CMH, Fleetwood, and Champion build single-family housing units, known as mobile homes, in several factories in the Southeastern United States; transport their mobile homes in interstate commerce to retail sales centers, including some within Catawba County; and through these sales centers sell the homes to individual purchasers in Catawba County and elsewhere.

12. Plaintiffs CMH, Fleetwood and Champion build mobile homes pursuant to the National Manufactured Housing and Safety Standards Act of 1974, 42 U.S.C. § 5401–5406, and in compliance with federal regulations promulgated thereunder by the Department of Housing and Urban Development (hereinafter referred to collectively as "HUD construction standards" or "the HUD code").

13. Plaintiff Elixir Industries ("Elixir") manufactures and distributes metal building products in interstate commerce to CMH and to other manufactures for use in the construction of mobile homes.

14. The parties stipulated that the manufacture and sale of single-wide manufactured homes with metal roofing and metal siding (and their component parts) impact interstate commerce, and that single-wide manufactured homes with metal roofs and metal siding (and their component parts) are lawful products which are transported through the channels of interstate commerce.

15. Manufactured homes provide an important source of affordable housing to the low and moderate-income citizens of Catawba County, as expressly recognized by North Carolina Law, N.C. Gen.Stat. §§ 153A–341.1 and 160A–383.1(a).

16. With the minor exceptions noted herein, the practical effect of the challenged portions of the amended Ordinance is to prohibit new single-wide manufactured homes constructed with metal roofing and/or vertical metal siding from being located in Catawba County.

17. Single-wide mobile homes with metal roofing or metal siding materials located in Catawba County prior to March 18, 1996 (or located in mobile home dealer's inventory prior to that date) are "grandfathered" by the Ordinance and may be located on an existing recorded subdivision lot, or in a mobile home park or "family subdivision."

18. Under Catawba County zoning classifications, R1 does not allow mobile homes, R2 allows double-wide and single-wide mobile homes, and R3 allows double-wide mobile homes but not single-wides.

19. Single-wide mobile homes are sold with a variety of options and upgrades, including vinyl siding and shingled roofs, at varying costs to the consumer. All three of the plaintiff manufacturers build a single-wide home product constructed with metal roofing and a vertical metal siding, and Plaintiff Elixir manufactures metal roofing and vertical metal siding for construction of manufactured homes. Each manufacturer Plaintiff also makes single-wide mobile homes with siding and roofing materials which meet the new requirements of the amended Ordinance.

20. The challenged amendments, requiring new single-wide mobile homes to have siding and shingles of a type similar to standard residential construction, were part of a comprehensive attempt by the Catawba County Commission to address the conflicts between citizens opposed to the proliferation of mobile homes in Catawba County and supporters of the unrestricted placement of mobile homes. During 1995 and early 1996, these conflicts were evidenced by many property owners' efforts to rezone property either to exclude single-wide mobile homes, or to exclude mobile homes altogether. Approximately six thousand (6000) acres were rezoned to exclude single-wide mobile homes, with the prospect that these "mass rezonings" would continue and the area available for affordable mobile home housing would continue to diminish.

21. In response to the 1995 and 1996 rezoning petitions, the Catawba County Commission adopted several strategies, including the adoption of the subject "appearance criteria." The purpose of the appearance criteria was to make single-wide mobile homes more closely resemble traditional, or "stick-built," construction, and thus to make them more palatable to nearby property owners.

22. At approximately the same time, the Catawba County Commission also amended its subdivision ordinance, making it more difficult for property owners to avoid the governance of the mobile home park ordinance by creating a "family subdivision" or "other minor subdivision" that could include mobile homes. This amendment to the subdivision ordinance, which was a part of the County's overall response to the "mass rezoning" requests, is not at issue in this lawsuit.

23. In adopting these strategies, the County Commission sought to balance the interests of potential mobile home owners and the mobile home industry with those of citizens who perceived that mobile homes were incompatible with existing land uses and/or caused a depreciation in property values. To accomplish this purpose, the Commission and County staff reviewed available zoning alternatives, and sought input from all interested citizens, including the mobile home industry.

24. Although not a party, the North Carolina Manufactured Housing Institute (NCMHI) is a trade association and advocacy group which solicited Plaintiffs to file this lawsuit and asked Ashok Goswami to appear as an expert witness on Plaintiffs' behalf.

25. The North Carolina Manufactured Housing Institute has promulgated a Model Act containing provisions that are virtually identical those at issue here, with the only substantial distinction being that the siding and shingle criteria in the Model Act apply only to double-wide mobile homes. This Model Act was drafted and distributed by the North Carolina Manufactured Housing Institute, the North Carolina League of Municipalities, and the North Carolina Association of County Commissioners.

26. A copy of the Model Act, with accompanying material entitled "Manufactured Housing: Zoning Alternatives to Address North Carolina Housing Needs—September, 1988" was furnished by a representative of the North Carolina Manufactured Housing Institute to Catawba County zoning and planning officials prior to the adoption of the amendments to the zoning ordinance at issue here.

27. Staff for Catawba County correctly determined that non-metal siding and roofing were commonly available as an option package offered by most, if not all, manufacturers of single-wide mobile homes. The difference in manufacturing cost per unit ranges from approximately $400 to $2,000.

28. The Defendants did not gather statistical or empirical evidence that the enacted appearance criteria would protect property values or that manufactured housing with metal roofing and metal siding devalues neighboring property or drains the tax base of the county. However, county representatives did testify that at public hearings on the issue of mobile home placement, proliferation, and zoning, numerous citizens expressed their concerns that the placement of mobile homes in their neighborhoods would diminish their property values significantly.

29. Since the amendment of the Ordinance, petitions for mass rezonings in Catawba County to exclude or restrict mobile homes have decreased greatly, with only four such petitions (two successful and two unsuccessful) having been filed since the amendment of the ordinance.

30. Both the wholesale and retail cost of a single-wide manufactured home that complies with the Ordinance are greater than the respective wholesale and retail cost of a single-wide manufactured home with metal roofing and metal siding, all other options being equal.

31. Retailers of manufactured homes in Catawba County had a market for single-wide homes with metal roofs and metal siding, which they sold to residents of Catawba County prior to the enactment of the Ordinance. Since the Ordinance was enacted, Clayton Homes, an affiliate of Plaintiff CMH,

has sold 28 new homes with metal roofing and metal siding from its inventory to residents of Catawba County (for placement in the county). At the time of trial, Clayton Homes had in its inventory two new homes with metal roofing and metal siding which it had been unable to sell to residents of Catawba County.

32. Clayton Homes retail salesman Jim Stone testified that he has been approached since the enactment of the ordinance by consumers who wanted to purchase single-wide manufactured homes with metal roofing and metal siding.

33. The federal Manufactured Housing Construction and Safety Standards promulgated by the Department of Housing and Urban Development (hereinafter "HUD") establish performance standards for materials and designs used in the construction of manufactured housing and do not prohibit the use of metal roofing in the construction of manufactured homes.

34. To ensure compliance with the federal Manufactured Housing Construction and Safety Standards, HUD has created a network of Design Approval Primary Inspection Agencies ("DAPIAs") to review and approve designs and plans submitted by manufacturers of manufactured housing. The National Conference of States on Building Codes and Standards ("NCSBCS") is a private agency with which HUD contracts to monitor and license the DAPIAs.

35. NTA, HWC, and RADCO are all DAPIAs which have issued approval for metal siding materials, metal roofing materials, and the installation or application of those materials in the construction of manufactured housing to Plaintiffs CMH, Fleetwood and Elixir and to other manufacturers of mobile homes.

36. Plaintiffs' expert Owen Tharrington, former Deputy Insurance Commissioner of North Carolina for its Manufactured Housing Division, described the HUD regulations as a "performance code," since they do not set forth particular materials or methods of construction, but instead, establish minimum levels of performance for materials used in manufactured homes. Mr. Tharrington also testified that the metal siding and roofing materials manufactured by Plaintiff Elixir and used by Plaintiff manufacturers had been tested by HUD authorized agencies and found to meet the HUD code performance standards for safety, durability, and quality; that the challenged amendments did establish construction standards for manufactured housing; and that the ordinances as amended were not identical to the federal standards.

37. Ashok Goswami, Director of the Division of Housing and Building Technology of the National Conference of States on Building Codes and Standards (NCSBCS), whom plaintiffs called as an expert on the federal Manufactured Home Construction and Safety Standards, expressed his opinion that the Ordinance sets a prescriptive requirement for the type of siding and roofing permitted on manufactured housing in Catawba County. Accordingly, it was Mr. Goswami's opinion that the amended Ordinance was preempted by the Act and the applicable HUD regulations.

38. Not all buildings in Catawba County are required to have shingled roofs and vinyl, aluminum or hardboard lap siding. The use of metal roofing and all types of metal siding as authorized under the North Carolina State Building Code is permitted in all types of residential and commercial construction in Catawba County, other than manufactured homes.

## II. *CONCLUSIONS OF LAW*

The Plaintiffs contend that the Catawba County zoning ordinance amendments are preempted by the National Manufactured Housing Construction and Safety Standards Act, 42 U.S.C. § 5401, *et seq.* (hereafter "the Act"), constitute an impermissible burden on interstate commerce in violation of Article I, Section 8 of the United States Constitution, and violate the substantive due process and equal protection clauses of the Fifth and Fourteenth Amendments to the United States Constitution. Plaintiffs seek a declaratory judgment declaring the challenged amendments to the ordinance invalid, injunctive relief prohibiting their enforcement, and attorneys' fees pursuant to 42 U.S.C. §§ 1983 and 1988.

## A. *Preemption by Federal Law*

■ The preemption doctrine is ultimately based on the Supremacy Clause of Article VI of the Constitution, which states:

This Constitution, and the Laws of the United States which shall be made in Pursuance thereof ... shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

U.S. Const. Art. VI, § 2. "From this Supremacy Clause flows the well-established principle that federal legislation, if enacted pursuant to the Congress' constitutionally delegated authority, can nullify conflicting state or local actions." *Cavallo v. Star Enterprise*, 100 F.3d 1150, 1154 (4th Cir.1996), *citing Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 210–11, 6 L.Ed. 23 (1824).

■ As the Fourth Circuit summarized the preemption doctrine in *Rum Creek Coal Sales, Inc. v. Caperton*, 971 F.2d 1148 (4th Cir.1992):

Preemption occurs in any of three manners: (1) Congress may pass a statute that by its express terms preempts state law, (2) Congress, though not expressly so stating may imply that it is preempting state law by occupation of an entire field of regulation, so that no room is left for supplementary state regulation, [or] (3) Congress may speak neither expressly nor impliedly of pre-emption, nonetheless state law is preempted to the extent it actually conflicts with federal law: such a conflict occurs when (a) compliance with both state and federal law is impossible or (b) when state law stands as an impediment to a federal purpose.

*Id.* at 1153, *citing Michigan Canners & Freezers Ass'n v. Agric. Mktg. & Bargaining Building*, 467 U.S. 461, 469, 104 S.Ct. 2518, 81 L.Ed.2d 399 (1984); *and Abbot v. American Cyanamid Co.*, 844 F.2d 1108, 1111 (4th Cir.1988). *Accord Worm v. American Cyanamid Co.*, 970 F.2d 1301, 1304–05 (4th Cir. 1992); *and Wolf v. Ford Motor Co.*, 829 F.2d 1277, 1278–79 (4th Cir.1987). Preemption analysis is the same for both state statutes and local ordinances. *City of Burbank v. Lockheed Air Terminal, Inc.*, 411 U.S. 624, 638, 93 S.Ct. 1854, 1862, 36 L.Ed.2d 547 (1973).

■ Where the statute contains an explicit preemption provision, there is no need to consider whether preemption may be implied. *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 517–18, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992). However, because there is a strong presumption against preemption of state police power, express preemption provisions are to be narrowly construed. *Cipollone*, 505 U.S. at 517–18. When construing preemption clauses, the court must "focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' preemptive intent." *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 113 S.Ct. 1732, 123 L.Ed.2d 387 (1993).

■ In the instant case, Plaintiffs claim that the Amendments to the Ordinances are preempted by § 5403(d) of the National Manufactured Home Construction and Safety Standards Act, which provides as follows:

Whenever a Federal manufactured home construction and safety standard established under this chapter is in effect, no State or political subdivision of a State shall have any authority either to establish, or to continue in effect, with respect to any manufactured home covered, any standard regarding construction or safety applicable to the same aspect of performance of such manufactured home which is not identical to the Federal manufactured home construction and safety standard.

42 U.S.C. § 5403(d). *See also* 24 C.F.R. § 3282.11(a). Similarly, the construction and safety standards established by HUD pursuant to the Act contain the following provisions:

(a) No State manufactured home standard regarding manufactured home construction and safety which covers aspects of the manufactured home governed by the Federal standards shall be established or continue in effect with respect to manufactured homes subject to the Federal standards and these regulations unless it is identical to the Federal standards.

\* \* \*

(d) No state or locality may establish or enforce any rule or regulation or take any action that stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress. The test of whether a state rule or action is valid or must give way is whether the state rule can be enforced or the action taken without impairing the Federal superintendence of the manufactured home industry as established by the Act.

24 C.F.R. § 3282.11(a), (d).

The parties agree that § 5403(d) is an explicit statement of Congressional intent to preempt state establishment of construction and safety regulations for mobile homes. Indeed, this provision of the Act has been found to set national standards for mobile homes, and to be expressly intended to prevent the application of local building codes to mobile homes. *See Scurlock v. City of Lynn Haven*, 858 F.2d 1521, 1523–25 (11th Cir. 1988); *Colorado Manufactured Housing Association v. Board of County Commissioners of the County of Pueblo, Colorado*, 946 F.Supp. 1539, 1548–51 (D.Colo.1996), *later proceeding sub nom. Colorado Manufactured Housing Association v. City of Salida*, 977 F.Supp. 1080, 1086–87 (D.Colo.1997). Defendants, however, argue that the siding and roofing requirements at issue are merely "appearance criteria," not "construction and safety" standards preempted by the Act. Furthermore, Defendants argue, the adoption of appearance criteria for manufactured homes is expressly authorized by North Carolina law.[2]

Construction and safety standards for mobile homes are promulgated by the Department of Housing and Urban Development ("HUD") pursuant to the Act, and are set forth in 24 C.F.R. § 3280.1 through § 3280.904. The term "Federal Manufactured Home Construction and Safety Standard" is defined in both 42 U.S.C. § 5402(7) and 24

C.F.R. § 3280.2 as "a reasonable standard for the construction, design and performance of a manufactured home which meets the needs of the public including the need for quality, durability, and safety."

In order to determine whether the Ordinance conflicts with the HUD regulations and the Act, it is appropriate to examine its legislative history and the HUD regulations which followed. *See Scurlock*, 858 F.2d at 1524. According to Congress, the purposes of the Act were "to reduce the number of personal injuries and deaths and the amount of insurance costs and property damage resulting from [mobile] home accidents and to improve the quality and durability of [mobile] homes." 42 U.S.C. § 5401. Thus, the Act has been properly described as "consumer safety legislation." *Scurlock*, 858 F.2d at 1524, *citing* 1974 U.S.Code Cong. & Admin. News 4279, 4340. For example, the Act requires manufacturers of mobile homes to notify purchasers about any construction or safety defects and correct them free of charge, to repair or "immediately repurchase" from the dealer homes which are discovered to be defective prior to purchase by the consumer, and to provide purchasers with manuals explaining the operation, maintenance, and repair requirements of their mobile homes. *Scurlock, supra, citing* 42 U.S.C. §§ 5414(a) and (g), 5412(a), and 5416. Additionally, HUD is authorized to release to the public information concerning construction and safety defects present in particular homes. *Id., citing* 42 U.S.C. § 5413(c)(5).

Following Congress' directive to regulate the safety of mobile homes, HUD has developed standards covering "all equipment and installations in the design, construction, fire safety, plumbing, heat-producing and electrical systems of [mobile] homes." 24 C.F.R. § 3280.1(a). The HUD regulations establish performance requirements specifically in order to protect the public against

---

**2.** N.C.G.S. § 160A–383.1 specifically provides as follows:

A city may adopt and enforce appearance and dimensional criteria for manufactured homes. Such criteria shall be designed to protect property values, to preserve the character and integrity of the community or individual neighborhoods within the community, and to promote the health, safety and welfare of area residents. The criteria shall be adopted by ordinance.

*See also* N.C.G.S. § 153A–341.1 (rendering this provision applicable to counties).

any unreasonable risk of death, injury, or the occurrence of accidents due to the design or construction of mobile homes, 24 C.F.R. §§ 3280.1(b) and 3280.2(a)(18).

It is thus manifest that the HUD regulations are directed at safety, and are not concerned with regulation of the appearance or aesthetic characteristics of manufactured housing.[3] Thus, in cases where municipalities have attempted to impose different *safety standards* on manufactured housing from those embodied in the HUD code, their ordinances have been found preempted by federal law. However, the parties have directed the Court to no case finding preemption of a regulation not impacting safety standards in some direct way.[4]

In the primary case relied on by Plaintiffs, *Georgia Manufactured Housing Association, Inc. v. Spalding County, Georgia*, Case No. 3:94–CV–51–GET (N.D. Ga., June 13, 1996) (unpublished opinion), a county ordinance required all manufactured housing to have a roof pitch of 4:12 (four feet of rise for every 12 feet of horizontal run), a minimum width of 16 feet, a masonry curtain wall enclosing the area between the base and the ground, and *"exterior siding . . . made from wood, hardboard, vinyl, brick, masonry, or aluminum and . . . as durable as exterior siding commonly used in conventional residential construction." Id.,* slip op. at 6 (emphasis added). While the *Spalding County* opinion is not controlling because it is unpublished and from another jurisdiction, it nevertheless does not support Plaintiff's position in the instant matter. The court in *Spalding County* found *only* the 4:12 roof pitch requirement to be preempted by 42 U.S.C. § 5403(d)— and did so primarily because a home with a 4:12 roof pitch had to be constructed and transported in ways that adversely affected the safety and durability of the finished prod-

uct. *Id.,* slip op. at 15–18. Most significantly, the court did *not* find the remaining provisions, *including the siding material requirements,* to be either preempted or unconstitutional. *Id.* at 27.

In *Scurlock,* the plaintiffs challenged the city of Lynn Haven's zoning ordinance, which required manufactured homes to comply with the "Southern Standard Building Code" ("SSBC") or be affixed with a seal from the Florida Department of Community Affairs in order to qualify for certain zoning classifications. 858 F.2d at 1523. As the court there noted, "much of the evidence at trial concerned the differences between the HUD requirements and those contained in the SSBC." The two sets of building standards were found to be equivalent, but not identical, and because the ordinance imposed greater safety standards, it interfered with the federal superintendence of the mobile home industry and was thus preempted by § 5403(d). *Id.* at 1524–25.

Similarly, the ordinances found preempted in the Colorado litigation subjected manufactured housing units to more stringent construction and safety standards than the HUD guidelines. *Colorado Manufactured Housing Association v. Board of County Commissioners of the County of Pueblo, Colorado,* 946 F.Supp. 1539, 1548–51 (D.Colo.1996), *later proceeding sub nom. Colorado Manufactured Housing Association v. City of Salida,* 977 F.Supp. 1080, 1086–87 (D.Colo.1997) All but two of the municipal defendants in that case had enacted zoning regulations requiring manufactured homes to comply with the Uniform Building Code ("UBC") to be eligible for placement within certain residential districts.[5] Relying on *Scurlock,* the court held that the UBC contained construction and safety standards different from the HUD standards; regardless of whether the UBC

---

3. Plaintiffs' expert, Ashok Goswami, conceded as much.

4. Indeed, the case law in this area indicates that municipalities often attempt to regulate placement of mobile homes, for subjective or aesthetic reasons, under the *guise* of a concern for safety. Since the imposition of a safety code imposing standards different from those in the HUD code clearly interferes with Congress' supervision and regulation of the safety of manufactured housing,

such efforts are subject to attack on preemption grounds. *See Scurlock, supra.*

5. Two Colorado municipalities, Fountain and Frederick, did *not* allow manufactured housing in any residential zone, but confined it to particular mobile home parks. 946 F.Supp. at 1551. It is not clear whether the plaintiffs in that case argued that these two town ordinances were preempted by the federal Act.

standards were more stringent than the HUD regulations, they certainly conflicted and those ordinances requiring compliance with the UBC were therefore preempted. *Id.* at 1552–53.

In *Texas Manufactured Housing Association, Inc. v. City of Nederland,* 101 F.3d 1095, (5th Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 2497, 138 L.Ed.2d 1003 (1997), plaintiffs challenged an ordinance prohibiting the placement of "trailer coaches" on any lot within the city limits except in a "duly authorized trailer park." The ordinance did not similarly restrict "modular" or "industrial" homes, which are also constructed off-site in components and transported to a residential site, but then erected on a permanent foundation in compliance with local building codes. *Id.* at 1098–99. The Court of Appeals for the Fifth Circuit held that the prohibition in certain residential zones of trailer coaches, which by definition met the HUD code standards, was not preempted by the Act. *Id.* at 1099–1100. The court distinguished *Scurlock,* noting that the ordinance invalidated in that case allowed manufactured housing in certain residential areas solely based on its compliance with local building codes; in contrast, the Nederland ordinance "regulate[d] the placement and permitting of trailer coaches for the purpose of protecting property values and does not expressly link its provisions in any way to local safety and construction standards." *Id.* at 1100. Since the plaintiffs had not provided evidence of material differences between the local building code and the HUD regulations, the court affirmed summary judgment for the defendants on Plaintiff's federal preemption claim. *Id.*

The local ordinances which were held preempted in the above cases each subjected mobile homes to local building codes—which by their very nature address safety concerns—as a prerequisite to their location (if at all) within the governing jurisdiction. In contrast, those portions of ordinances which imposed appearance criteria or zoning restrictions on the placement of manufactured housing (without regard to building, construction, or safety concerns) were consistently upheld.

In the instant case, Catawba County enacted the amendments to its zoning ordinance as part of a comprehensive plan to balance the interests of citizens who opposed mobile home proliferation with those of the manufactured housing industry and its customer base. The amendments establish appearance criteria—including a prohibition on metal siding and metal roofs—for single-wide mobile homes in order to make them appear more attractive, less likely to drive down nearby property values, and generally more palatable to the objecting public. Furthermore, as previously noted, the amendments avoided extremes by "grandfathering" existing "metal on metal" mobile homes, and by allowing their placement in mobile home parks, existing lots of record, or existing or new "family subdivision" lots.

To establish that the HUD regulations preempt the Catawba County Ordinance roofing and siding requirements, Plaintiffs offered the testimony of two expert witnesses, Owen Tharrington, a former deputy Insurance Commissioner of North Carolina for its Manufactured Housing Division, and Ashok Goswami, Director of the Division of Housing and Building Technology of the National Conference of States on Building Codes and Standards (NCSBCS). Both Mr. Goswami and Mr. Tharrington described the HUD regulations as a "performance code," which—in order to encourage innovation—does not set forth particular materials or methods of construction;[6] instead, the code sets minimum performance standards which manufactured homes must meet.

Mr. Tharrington opined that the metal siding and roofing materials manufactured by Plaintiff Elixir and used by Plaintiff manufacturers had been tested by HUD authorized agencies and found to meet the HUD code performance standards for safety, durability, and quality; that the challenged amendments did establish construction standards for manufactured housing; and that

---

**6.** In contrast, a "prescriptive code" delineates specific materials and methods of construction

which must be used.

the amended ordinances were not identical to the federal standard. However, Mr. Tharrington also admitted that he had been hired by Plaintiffs to give an opinion; that his expertise was in engineering, not law; that his present part-time employer, Martindale Homes, was a member of the North Carolina Manufactured Housing Institute (the trade and advocacy group which co-authored the Model Act and recruited the Plaintiffs in this case); that he had not seen or reviewed the Catawba County ordinances until the day of his deposition; and that the NCMHI's own Model Act imposed identical roofing and siding appearance criteria for double-wide mobile homes, which criteria likewise would be preempted by his analysis.

Mr. Goswami testified that he had gained expertise and familiarity with the HUD regulations through his agency's efforts to monitor compliance with HUD code standards and train manufactured home inspectors in all fifty states. In addition to echoing Mr. Tharrington's testimony that the ordinances established construction standards which conflicted with the non-prescriptive approach taken by the HUD regulations, Mr. Goswami identified particular portions of the regulations which established performance criteria for roofing and siding and opined that these criteria were by their very nature also "safety standards." Thus, it was also Mr. Goswami's opinion that the Catawba County "appearance criteria" were, in fact, construction and safety standards preempted by the federal Act.

Significantly, however, neither expert testified that vinyl siding / shingle roof manufactured homes were more (or less) safe than the metal siding / metal roof variety excluded by the Ordinance. While the law is clear that the county would not be allowed to impose a standard making manufactured homes more or less safe, Plaintiffs offered no evidence that the required upgrade in siding and roofing had any ultimate impact on safety. Likewise, there is nothing in the HUD code to indicate a preference, in terms of safety, for either variety of shingle or roofing material.

Construing the Act and the HUD code narrowly, the Court concludes that the federal standards and regulations do not address, and therefore do not preempt, the appearance and zoning criteria in the challenged ordinance. While Congress and HUD have determined what materials (in terms of performance) are minimally safe, nothing in the Act or regulations prevents a municipality from determining that certain materials, no matter how safe, are so aesthetically distasteful or are having such a negative impact on property values (documented or perceived) that they should thus be confined to limited residential areas or even banned altogether. *Cf. Scurlock,* 858 F.2d at 1525 (holding that municipality would have been permitted to exclude mobile homes altogether from certain residential districts) *and Texas Manufactured Housing Association, Inc. v. City of La Porte,* 974 F.Supp. 602, 605(S.D.Tex.1996) (mere restriction on location of manufactured housing not preempted by federal statute). Contrary to Plaintiffs' contentions, the challenged amendments leave regulation of the safety and performance of roofing and siding materials to Congress and HUD; they merely remove from the range of safe and satisfactorily performing materials only certain ones based exclusively on their undesirable appearance. Such regulation of appearance is clearly authorized · by N.C.G.S. § 160A–383.1 and § 153A–341.1.

Applying the pertinent regulatory language, the Catawba County ordinances are not preempted by the Act because they do not establish a "standard regarding construction or safety *applicable to the same aspect of performance* ... which is not identical to the Federal manufactured home construction and safety standard." *See* 42 U.S.C. § 5403(d). The roofing and siding requirements address aesthetic concerns only, and are not "applicable to" the performance standards set forth in the regulations. Likewise, the ordinance amendments do not "cover[] aspects of the manufactured home governed by the Federal standards," "stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," or otherwise "impair[] the Federal superintendence of the manufactured home

industry as established by the Act." 24 C.F.R. § 3282.11(a), (d).[7]

## B. *Violation of Commerce Clause*

The Commerce Clause provides that "Congress shall have Power [t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. Const., Art. I, § 8, cl. 3. In addition to empowering Congress to regulate commerce among the states, the Commerce Clause implicitly restricts the states' power to burden interstate commerce. *Environmental Technology Council v. Sierra Club,* 98 F.3d 774, 782 (4th Cir.1996), *cert. denied sub nom. South Carolina v. Environmental Technology Council,* —— U.S. ——, 117 S.Ct. 2478, 138 L.Ed.2d 987 (1997). This "dormant," or "negative," aspect of the Commerce Clause thus "denies the States the power unjustifiably to discriminate against or burden the interstate flow of articles of commerce." *Id., citing Oregon Waste Systems, Inc. v. Department of Envtl. Quality,* 511 U.S. 93, 98, 114 S.Ct. 1345, 128 L.Ed.2d 13 (1994). The dormant Commerce Clause also prevents political subdivisions of the States from enacting regulations that burden interstate commerce. *Fort Gratiot Sanitary Landfill, Inc. v. Michigan Dep't Natural Resources,* 504 U.S. 353, 361, 112 S.Ct. 2019, 119 L.Ed.2d 139 (1992); *Colorado Manufactured Housing Association v. City of Salida,* 977 F.Supp. at 1086–87.

An ordinance discriminating against interstate commerce by favoring the enacting state's economic interests over out-of-state interests is unconstitutional unless the discrimination is justified on some valid basis unrelated to economic protectionism. *Fort Gratiot,* 504 U.S. at 359–61. However, as the U.S. Supreme Court held in *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970), a statute that is not protectionist in intent or practical effect, and only burdens interstate commerce incidentally, *"will be upheld* unless the burden imposed on such commerce is *clearly excessive* in relation to the putative local benefits." 397 U.S. at 142 (emphasis added). As the Court stated in *Pike,* "If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities." *Id.; see also City of Nederland,* 101 F.3d at 1099–1101 (applying *Pike* analysis).

Plaintiffs do not contend that the challenged ordinance amendments are protectionist in nature, and the parties agree that the test articulated in *Pike* governs the commerce clause issue in the present dispute. Applying this test, the Court finds that the burden which the siding and roofing requirements impose on interstate commerce is not clearly excessive in relation to the local benefits which they confer.

As for the benefits of the siding and roofing requirements, Defendants offered evidence that they sought to reduce the community strife associated with the "mass rezoning" requests noted above, to prevent further diminution of land available for the placement of mobile homes, and to preserve the property value and aesthetic standards of neighborhoods in Catawba County. In particular, County Planner Mary George, County Commissioner David Stewart, and County Zoning Administrator Donna Caldwell all testified regarding the magnitude of the rezoning requests they had received, the divisiveness of the controversy between mobile home supporters (who need affordable forms of home ownership) and opponents (who were legitimately concerned

---

7. This conclusion is further supported by Plaintiffs' counsel's concessions, during closing argument, that the NCMHI's Model Act (drafted in part by Plaintiff's counsel) contains roofing and siding appearance criteria identical to those enacted by Catawba County; that the primary difference between the Model Act and the amended Ordinance was that the roofing and siding appearance criteria applied only to double-wide (or multi-section) homes in the Model Act; that the amended Ordinance would not be preempted if, like the Model Act, it left a portion of the county zoned for manufactured homes that met the HUD code but did not meet the appearance criteria; and that, by the grandfatherng provision, the County had in fact carved out some areas in which metal-on-metal mobile homes could be placed or moved even after the adoption of the amended Ordinance.

about aesthetic standards and the prospect of falling property values), and the thorough research and solicitation of community input which they conducted prior to enacting the amendments. The Defendants' evidence also established that the number of rezoning requests had decreased dramatically since the passage of the amendments, and that for the most part citizens seemed pleased with the changes.

The Plaintiffs' evidence as to burden merely established that some mobile home manufacturers used to sell metal-on-metal mobile homes to Catawba County residents, but could no longer do so. Each Plaintiff manufacturer who presented testimony admitted that it also manufactured and sold single-wide mobile homes which complied with the appearance criteria, that all its double-wide homes would meet the appearance criteria, and that it had continued to make a profit on mobile home sales in Catawba County and statewide after the subject amendments were adopted. Although there was brief testimony that a few individuals in Catawba County expressed interest in purchasing single-wide mobile homes with metal siding and metal roofs after the Ordinance was amended, Plaintiffs presented no concrete evidence of lost sales or lost profits, or of potential low-end purchasers who could afford no other model of mobile home. Indeed, the evidence tended to show that mobile homes are sold pursuant to installment sales contracts or long term financing arrangements, and that the additional cost of siding and roofing which complied with the appearance criteria, like that of any other upgrade option, could be built into the financing arrangement with only a *de minimis* increase in the purchaser's monthly payment.

On these facts, the Plaintiffs have not come close to establishing that the Ordinance's burden on interstate commerce (or even on the Plaintiffs themselves) is *"clearly excessive* in relation to" its local benefits, that is, in relation to its benefits to Catawba County, its residents, and its government. *See City of Salida,* 977 F.Supp. at 1087–89 (applying *Pike* analysis and finding no commerce clause violation); *City of Nederland,* 101 F.3d at 1101, 1104 ("ostensible burden" of

"lost sales of HUD-code manufactured homes manufactured by out-of-state firms for placement on individual, privately-owned lots in the City of Nederland" was neither a burden on interstate commerce nor "clearly excessive" to local benefits of preserving property values).

### C. *Substantive Due Process and Equal Protection*

To prevail on a substantive due process claim challenging the enactment of zoning ordinances, Plaintiffs must establish that the challenged regulation is "clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare." *City of Salida, supra,* 977 F.Supp. at 1084–85, *citing Village of Euclid, Ohio v. Ambler Realty Co.,* 272 U.S. 365, 395, 47 S.Ct. 114, 71 L.Ed. 303 (1926) *and Jacobs, Visconsi & Jacobs, Co. v. City of Lawrence, Kansas,* 927 F.2d 1111, 1119 (10th Cir.1991). In other words, a zoning ordinance will not violate the Due Process Clause unless plaintiffs can show that there is no rational basis for the ordinance. *Id., citing City of Nederland, supra,* 101 F.3d at 1106.

Since the ordinance at issue involves neither a suspect (or quasi-suspect) classification nor a fundamental right, Plaintiffs' equal protection claim is also analyzed under the rational basis standard. Under this test, "a law will be sustained if it can be said to advance a legitimate government interest, even if the law seems unwise or works to the disadvantage of a particular group, or if the rationale for it seems tenuous." *City of La Porte,* 974 F.Supp. at 605, *quoting Romer v. Evans,* 517 U.S. 620, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996). As the Supreme Court recognized in *Romer,* "most legislation classifies for one purpose or another, with resulting disadvantage to various groups or persons." 517 U.S. at 631, 116 S.Ct. at 1627, *citing Personnel Administrator of Mass. v. Feeney,* 442 U.S. 256, 271–72, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979).

The Equal Protection Clause "is not a license for courts to judge the wisdom, fairness, or logic of legislative choices," and those challenging the rationality of a legisla-

tive classification have the burden to negate "every conceivable basis" which might support it. *Id., citing Federal Communications Comm'n v. Beach Communications, Inc.,* 508 U.S. 307, 313–16, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993). Moreover, the absence of legislative facts explaining a classification has no significance in the rational basis analysis, since the classification "may be based on rational speculation unsupported by evidence or empirical data." *Beach Communications,* 508 U.S. at 314–16.

 To prevail on either of these constitutional claims, therefore, Plaintiffs must establish that the ordinance has no reasonable basis, i.e., is not rationally related to a legitimate local governmental interest. *Jacobs, Visconsi & Jacobs,* 927 F.2d at 1119; *City of Nederland,* 101 F.3d at 1106. As has been previously noted, the evidence establishes to the contrary that the County Commissioners carefully and responsibly sought to address a growing conflict between citizens opposed to the proliferation of mobile homes in Catawba County and those supporting unrestricted placement of mobile homes. Having been flooded with rezoning requests, the Commissioners sought and charted a middle course, enacting standards which would make the appearance of single-wide mobile homes more acceptable and protect the aesthetic character and value of surrounding properties—without drastically reducing the availability or diversity of manufactured housing in Catawba County.

Addressing citizen concerns over aesthetics, zoning, and falling property values (actual or perceived) is clearly a legitimate government interest. *See City of Nederland,* 101 F.3d at 1101 n. 10 ("There can be no dispute that the governmental interest at stake is legitimate. Maintenance of property values has long been recognized as a legitimate objective of local land use regulation"); *City of Salida,* 977 F.Supp. at 1085–86 (responding to public *perception* of decrease in value is legitimate government interest). In short, for the previously stated reasons, the roofing and siding requirements in the amended Ordinance were rationally related to legitimate government interests, were neither arbitrary nor unreasonable, and were otherwise consistent with the substantive due process and equal protection guarantees under the U.S. Constitution.

### D. Attorney's fees under 42 U.S.C. § 1983 and § 1988

Since Plaintiffs have not prevailed on their constitutional (or statutory) claims, they are not entitled to attorney's fees or costs under §§ 1983 and 1988.

**NOW THEREFORE, IT IS ORDERED, ADJUDGED, AND DECREED** as follows:

1. The siding and roof requirements of Sections 515.075 and 515.076 of the Catawba County Zoning Ordinance **are not** "construction and safety standards" as defined in the Act at 42 U.S.C. § 5402(7) and in the regulations promulgated thereunder at 24 C.F.R. § 3280.2. Rather, they are "appearance criteria" authorized by North Carolina General Statutes § 160A–383.1(d), as applied to counties through North Carolina General Statutes § 153A–341.1.

2. The Catawba County Zoning Ordinance amendments (§§ 515.075 & 515.076) **are not** preempted by the National Manufactured Home Construction and Safety Standards Act.

3. The Catawba County Zoning Ordinance amendments **do not** violate the Commerce Clause of the United States Constitution.

4. The Catawba County Zoning Ordinance amendments **do not** violate the equal protection and substantive due process guarantees of the Fourteenth Amendment to the United States Constitution.

5. The Plaintiffs **are not** entitled to recovery of attorneys' fees or costs pursuant to 42 U.S.C. §§ 1983 and 1988.

6. The Clerk is directed to send copies of this Memorandum of Decision and Order, and the Judgment to be filed simultaneously herewith, to counsel for the parties.