United States Court of Appeals
Fifth Circuit

**F I L E D**

**June 3, 2004**

Charles R. Fulbruge III
Clerk

Revised June 21, 2004

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 03-50479

_____

INTERNATIONAL TRUCK AND ENGINE CORPORATION,

Plaintiff-Appellant,

versus

BRETT BRAY, In his official capacity as the Director of the Motor
Vehicle Division of the Texas Department of Transportation and
Chief Executive and Administrative Officer of the Motor Vehicle
Board of the Texas Department of Transportation,

Defendant-Appellee.

--------------------
Appeal from the United States District Court
for the Western District of Texas
--------------------

Before KING, Chief Judge, and BENAVIDES and CLEMENT, Circuit
Judges.

BENAVIDES, Circuit Judge:

Plaintiff-Appellant International Truck and Engine
Corporation, a manufacturer of medium- and heavy-duty trucks,
operates two used truck centers at which it sells trucks of the
kind it manufactures. Defendant-Appellee Brett Bray is Director of
the Motor Vehicle Division of the Texas Department of
Transportation, the agency responsible for regulating sales of
motor vehicles in Texas. Since 1999, the Director has maintained

that Texas law prohibits motor vehicle manufacturers like International from owning, operating, controlling, or acting as dealers of motor vehicles. *See* Tex. Occ. Code Ann. § 2301.476 (Vernon 2004). The Director has therefore refused to renew International's license to operate its used truck centers.

International contends that this refusal is unlawful. First, International argues that section 2301.476(c) prohibits manufacturers from acting as dealers of new vehicles, not from acting as dealers of used vehicles. Alternatively, International argues that if section 2301.476(c) applies to used vehicles, then it violates the dormant Commerce Clause. The district court granted summary judgment in favor of the Director. Because we conclude that section 2301.476(c) prohibits International from acting as a dealer of used vehicles and does not violate the dormant Commerce Clause, we affirm the judgment of the district court.

I.

Since 1995, the Texas Motor Vehicle Code has prohibited manufacturers of motor vehicles from operating as dealers of new motor vehicles. *See* Act of June 8, 1995, ch. 357, §§ 2, 18, 1995 Tex. Gen. Laws 2887, 2889, 2900 (codified at Tex. Rev. Civ. Stat. Ann. art. 4413(36), § 5.02(a), (b)(25) (Vernon Supp. 1999) (amended

2

1999)).  This provision did not affect International's used truck centers, which sold used trucks only.[1]

In 1999, the Texas Legislature extensively amended the Motor Vehicle Code.  *See* Act of June 18, 1999, ch. 1047, 1999 Tex. Gen. Laws 3861.  As amended, the Code included section 5.02C(c), which provided that "a manufacturer or distributor may not directly or indirectly: (1) own an interest in a dealer or dealership; (2) operate or control a dealer or dealership; or (3) act in the capacity of a dealer."  *Id.* § 14, 1999 Tex. Gen. Laws at 3875 (codified at Tex. Rev. Civ. Stat. Ann. art. 4413(36), § 5.02C(c) (Vernon Supp. 2002) (repealed 2003)).  The Motor Vehicle Division, which was responsible for enforcing this provision of the Code, interpreted section 5.02C(c) as prohibiting manufacturer control of any dealer, not just dealers of new vehicles.

Section 5.02C(c) thus prohibited International from owning and operating its used truck centers, and in 2000, the Motor Vehicle Division announced that it would not renew International's dealer license.  International then sued the Director in federal court for declaratory and injunctive relief.  International conceded that, as written, section 5.02C(c) prohibited it from acting as a dealer of

---

[1]  Texas statutes do not use the term "used" to describe motor vehicles, but they do define "new motor vehicle" as "a motor vehicle that has not been the subject of a 'retail sale' regardless of the mileage of the vehicle," Tex. Occ. Code § 2301.002(24).  The large majority of trucks at issue in this case are not "new" under Texas law, so for ease of reference, we will call these trucks "used."  We do not intend by our references to "new" and "used" to adjudicate whether any vehicles are "new motor vehicles" under Texas law or to delineate by implication the scope of section 2301.476(c).

3

used trucks. International, however, argued that section 5.02C(c) was invalid because it violated the dormant Commerce Clause and the Equal Protection Clause. The parties agreed that International could continue to operate its used truck centers during the pendency of the district court case and this appeal.

While International's suit was pending in the district court, we addressed a similar challenge to section 5.02C(c) in *Ford Motor Co. v. Texas Department of Transportation*, 264 F.3d 493 (5th Cir. 2001). Ford wanted to sell "pre-owned" motor vehicles through a website and alleged that section 5.02C(c) violated a number of constitutional provisions, including the dormant Commerce Clause. *Id.* at 498. International submitted a brief as an amicus curiae in support of Ford. We rejected Ford's and International's arguments and held that Texas could constitutionally prohibit manufacturers from controlling dealers. *Id.* at 499-505.

International subsequently amended its complaint. International maintained its constitutional challenges and also argued that, as interpreted in *Ford*, section 5.02C(c) did not bar manufacturers from controlling dealers of used vehicles. International then sought partial summary judgment on its statutory claim only. The Director answered International's amended complaint and sought summary judgment on International's statutory and constitutional claims.

The district court granted summary judgment to the Director. The court determined that statements in *Ford* purporting to limit section 5.02C(c) to sales of new vehicles were non-binding dicta and construed section 5.02C(c) to prohibit manufacturer control of all motor vehicle dealers. The court also ruled that section 5.02C(c) violated neither the Commerce Clause nor the Equal Protection Clause. International appealed.[2]

While this appeal was pending, a nonsubstantive recodification passed by the Legislature in 2001 became effective. *See* Act effective June 1, 2003, ch. 1421, §§ 5, 13, 2001 Tex. Gen. Laws 4570, 4954, 5020. This recodification repealed section 5.02C(c) of the Motor Vehicle Code and enacted an identical provision as section 2301.476(c) of the Occupations Code. *Id.* The parties have clarified that International is challenging section 2301.476, the current version of Texas's ban on manufacturer control of dealers.

Therefore, this appeal raises two questions: whether section 2301.476(c) bars manufacturers from owning, operating, or acting as dealers of used vehicles and, if so, whether section 2301.476(c) violates the dormant Commerce Clause.[3] We review de novo the

---

[2] On appeal, International has abandoned its claim under the Equal Protection Clause.

[3] In one heading in its appellate brief, International purports to have advanced a "Procedural-Due-Process Claim." International has not supported this heading with any arguments or authorities pertaining to procedural due process, so we treat International's argument about the meaning of section 2301.476(c) as presenting a question of statutory interpretation, not a question of constitutional law.

district court's grant of summary judgment. *See New Orleans Assets, L.L.C. v. Woodward*, 363 F.3d 372, 374 (5th Cir. 2004).[4]

## II.

We first address whether section 2301.476(c) bars manufacturers from owning, operating, controlling or acting as dealers of used vehicles. International, relying principally on our treatment of section 5.02C(c) in *Ford*, argues that "dealer" refers only to a dealer of new motor vehicles. Therefore, International argues, section 2301.476(c) does not prohibit it from acting as a dealer of used trucks. The Director maintains that section 2301.476(c) bars a manufacturer from owning, operating, or acting as a dealer of any vehicles whether new or used. We conclude that *Ford*'s treatment of section 5.02C(c) does not bind us and that section 2301.476(c) applies to dealers of new and used motor vehicles.

## A.

---

[4] We have jurisdiction to consider this controversy. The Director, relying on *Fleet Bank, National Association v. Burke*, 160 F.3d 883 (2d Cir. 1998), argues that International's constitutional claims are insufficient to invoke federal question jurisdiction under the well-pleaded complaint rule. *Fleet Bank* is inapposite. The Second Circuit carefully limited its holding in *Fleet Bank* to the context of preemption. *Id.* at 889. Preemption, standing alone, creates a federal defense but not a federal question. *Id.* International's dormant Commerce Clause challenge, in contrast, raises a federal question.

In a cursory reference at the beginning of his brief, the Director also claims sovereign immunity from International's suit. The Director waived sovereign immunity. A state "cannot simultaneously proceed past the motion and answer stage to the merits and hold back an immunity defense." *Neinast v. Texas*, 217 F.3d 275, 279 (5th Cir. 2000). By seeking summary judgment on the merits before raising sovereign immunity, the Director did exactly that.

We begin by determining whether *Ford*'s treatment of 2301.476(c)'s predecessor, section 5.02C(c) of the Motor Vehicle Code, controls our interpretation of section 2301.476(c). In *Ford*, we stated twice that section 5.02C(c) of the Motor Vehicle Code applied only to dealers of new motor vehicles. 264 F.3d at 504 n.5, 508-09. The district court treated these statements as non-binding dicta, but International argues that they are binding interpretations of Texas law.

The first passage relied upon by International appears in *Ford*'s discussion of the dormant Commerce Clause. *Id.* at 499-505. Ford had argued that section 5.02C(c) did not further Texas's purported interest in reducing manufacturer leverage over dealers because Ford did not enjoy a superior position in the market for the "pre-owned vehicles" it sought to sell. *Id.* at 503-04. In the course of rejecting this argument, we commented in a footnote that "[t]he Code only prohibits a manufacturer from selling 'new motor vehicles'--motor vehicles which have not been the subject of a prior retail sale." *Id.* at 504 n.5.

This statement is dictum and, as such, does not bind us. *See Gochicoa v. Johnson*, 238 F.3d 278, 286 n.11 (5th Cir. 2000). A statement is dictum if it "could have been deleted without seriously impairing the analytical foundations of the holding" and "being peripheral, may not have received the full and careful consideration of the court that uttered it." *Id.* (quoting *In re*

7

*Cajun Elec. Power Coop., Inc.*, 109 F.3d 248, 256 (5th Cir. 1997)). A statement is not dictum if it is necessary to the result or constitutes an explication of the governing rules of law. *Id.*

Our commentary in the footnote at issue was not necessary to the resolution of Ford's dormant Commerce Clause challenge and we did not rely on it in rejecting that challenge. Moreover, this statement was not an explication of the law governing our analysis, but commentary on a quirk in the Texas statutes. Therefore, the first passage relied upon by International is dictum, and we may disregard it.

The second passage relied upon by International appears in *Ford*'s discussion of vagueness. *See* 264 F.3d at 507-10. Ford claimed that it had no fair notice of what conduct constituted "operating or controlling a dealer" or "acting in the capacity of a dealer" under Texas law. *Id.* at 507. We addressed this claim by explaining section 5.02C(c). We began with the premise that "[t]he Motor Vehicle Code provides that for purposes of [section] 5.02, 'dealer' means 'franchised dealer'" and therefore reasoned that "in deciding whether [section] 5.02C(c) provides a comprehensible standard for 'acting in the capacity of a dealer,' this Court must first look to the definition of a franchised dealer." *Id.* We then

observed that franchised dealers are dealers of new motor vehicles. *Id.*[5]

Whether this section of *Ford*'s analysis represents dictum is a close question. *Ford*'s equation of dealer and franchised dealer was not strictly necessary to its conclusion that section 5.02C(c) was not vague. Rather, the crux of *Ford*'s vagueness analysis is that "[t]he phrase 'in the capacity of a dealer' is naturally read to include those activities performed by a licensed dealer," and that "[t]he Code defines exactly what activities are performed by a dealer--buying, selling, or exchanging motor vehicles." *Id.* at 510. This analysis did not hinge on whether vehicles are new or used. Nevertheless, the *Ford* panel's explanation of the challenged statute was not mere commentary but was arguably part of *Ford*'s explication of governing law. *See Gochicoa*, 238 F.3d at 286 n.11. In essence, *Ford* reasoned that section 5.02C(c) was not vague because it had a particular meaning, albeit a meaning section 5.02C(c) may not have had.

We need not resolve this question, however, because even were this second passage not dicta, it still would not bind us. A prior

---

[5] Texas law provides for several different types of dealers. *See* Tex. Occ. Code Ann. § 2301.002(7), (16), (25) (Vernon 2004); Tex. Transp. Code Ann. § 503.001(4) (Vernon Supp. 2004). A franchised dealer buys, sells, and exchanges new motor vehicles. Tex. Occ. Code Ann. § 2301.002(16); Tex. Transp. Code § 503.001(8). "Nonfranchised" dealers include wholesale motor vehicle dealers and independent motor vehicle dealers. Tex. Occ. Code Ann. § 2301.002(25). Wholesale motor vehicle dealers sell motor vehicles to other dealers or to certain foreign dealers. Tex. Transp. Code Ann. § 503.001(16). Independent motor vehicle dealers are all other dealers. *Id.* § 503.001(9). International fits in this residual category, so it holds an independent dealer's license.

panel opinion's interpretation of state law binds us no less firmly than a prior panel interpretation of federal law would. *Am. Int'l Specialty Lines Ins. Co. v. Canal Indem. Co.*, 352 F.3d 254, 270 n.4 (5th Cir. 2003). When we interpret state law, however, we are also bound to apply the law as the state's highest court would. *FDIC v. Abraham*, 137 F.3d 264, 267-68 (5th Cir. 1998). To balance these obligations, we recognize that we need not follow a prior panel opinion when a subsequent state court decision or statutory amendment shows that a prior panel decision was clearly wrong. *Id.* at 269.

A subsequent statutory amendment undermines the passage in question. In 2001, the Legislature passed a recodification of section 5.02C(c) that became effective in 2003. *See* Act effective June 1, 2003, ch. 1421 §§ 5, 13, 2001 Tex. Gen. Laws 4570, 4954, 5020. As part of this recodification, the Legislature repealed article 4413(36) of the Motor Vehicle Code, including section 5.02C(c), and replaced it with chapter 2301 of the Occupations Code. *Id.* §§ 5, 13, 2001 Tex. Gen. Laws at 4954, 5020.

The Legislature intended this recodification to be nonsubstantive. *Id.* § 14, 2001 Tex. Gen. Laws at 5020. In most cases, that intent would confirm that a prior panel's prediction of state law was correct. In this unique instance, however, the nonsubstantive nature of the recodification leads us to precisely

the opposite conclusion.[6]  We stated in *Ford* that "[t]he Motor Vehicle Code provides that for purposes of [section] 5.02, 'dealer' means 'franchised dealer.'"  264 F.3d at 508.  The only plausible basis for this statement was old section 5.02(a), which provided: "*In this section*, 'dealer' means 'franchised dealer.'"  Tex. Rev. Civ. Stat. Ann. art. 4413(36), § 5.02(a) (Vernon 2002) (repealed 2003) (emphasis added).  We then assumed that the equation of "dealer" and "franchised dealer" in old section 5.02(a) applied to old section 5.02C.  *See Ford*, 264 F.3d at 508.

Subsequent legislation, however, clarifies that section 5.02(a) applied only within section 5.02 and that section 5.02C was a separate section.  The recodification eliminated old section 5.02(a), and the subsections to which section 5.02(a) had applied were modified to clarify that they apply only to franchised dealers.  *See* Act effective June 1, 2003, §§ 5, 13, 2001 Tex. Gen.

---

[6] The Texas Supreme Court confronted the meaning of a purportedly nonsubstantive recodification in *Fleming Foods of Texas, Inc. v. Rylander*, 6 S.W.3d 278 (Tex. 1999).  In that case, the Legislature directed that a statute be recodified without substantive changes, but the plain text of the recodified statute bore a meaning different from its predecessor. *Id.* 280-81. Despite the fact that the Legislature had intended that the recodification be nonsubstantive, the court held that the plain text of the recodified statute controlled. *Id.* at 286.  In particular, the court emphasized the importance of Texas's citizens being able to rely upon the plain text of a current law rather than having to examine legislative and statutory history. *Id.* 284-85.

*Fleming Foods* does not control this case because the text of section 2301.476(c) does not unequivocally demonstrate that the recodification was, in actuality, substantive. *See id.* at 286.  Rather, it is precisely the nonsubstantive nature of the recodification that proves our prior interpretation was in error.  We note with interest, however, the Texas Supreme Court's adherence to the text of the recodified statute in roughly analogous circumstances.  We also echo the Texas Supreme Court's concern that citizens be able to rely on the plain text of the current Code.

Laws at 4439, 4947-53, 5020. *Compare* Tex. Occ. Code Ann. §§ 2301.251, 2301.451-.471 (Vernon 2004), *with* Tex. Rev. Civ. Stat. Ann. art. 4413(36), § 5.02(b)(1)-(27). In contrast, when section 2301.476(c) replaced section 5.02C(c), the new provision was not modified to demonstrate its application to franchised dealers only. *See* Act effective June 1, 2003, § 5, 2001 Tex. Gen. Laws at 4954. *Compare* Tex. Occ. Code Ann. § 2301.476(c), *with* Tex. Rev. Civ. Stat. Ann. art. 4413(36), § 5.02C(c). If *Ford* were correct, the wording of section 5.02C(c) would likewise have been changed. As the Occupations Code stands, however, the basis for *Ford*'s equation of "dealers" and "franchised dealers" has evaporated. Therefore, *Ford*'s understanding of section 5.02C(c) does not control our interpretation of section 2301.476(c).[7]

## B.

We thus turn to the meaning of section 2301.476(c) as currently codified. Applying Texas principles of statutory interpretation, *see Tonkawa Tribe v. Richards*, 75 F.3d 1039, 1046 (5th Cir. 1996), we hold that the term "dealer" in section 2301.476(c) extends to all dealers, not just dealers of new vehicles.

---

[7] Our understanding of section 2301.476(c) does not undermine *Ford*'s holding that section 5.02C(c) was not vague. Now, as in *Ford*, Texas statutes delineate what conduct is prohibited by defining what activities constitute acting as a dealer. *See Ford*, 264 F.3d at 410.

12

First, when a statute defines a term, Texas courts must construe that term according to its statutory definition. Tex. Gov't Code Ann. § 311.011(b) (Vernon 1998); *Tex. Dep't of Transp. v. Needham*, 82 S.W.3d 314, 318 (Tex. 2002). In chapter 2301 of the Texas Occupations Code, the term dealer means "a person who holds a general distinguishing number," i.e, a dealer's license. Tex. Occ. Code Ann. § 2301.002(7), (17). All dealers must hold general distinguishing numbers whether the vehicles they sell are new or not. *See* Tex. Transp. Code §§ 503.021, 503.029 (Vernon 1999). In fact, International filed this suit to retain the general distinguishing number it needs to operate its used truck centers. Therefore, the term "dealer" encompasses all dealers, including International.

Second, Texas courts must interpret statutory terms consistently. *See Needham*, 82 S.W.3d at 318. If "dealer" meant only "a dealer of new vehicles" for purposes of section 2301.476(c), then a "dealer" in section 2301.476(c) would be different from a "dealer" in other parts of the Occupations and Transportation Codes. *See* Tex. Occ. Code Ann. § 2301.002(7), (17); Tex. Transp. Code Ann. § 503.002(4) (Vernon Supp. 2004). To remain consistent throughout the Occupations and Transportation Codes, "dealer" must include dealers of used vehicles.

Third, Texas courts avoid interpreting statutory language as superfluous. Tex. Gov't Code Ann. § 311.021(2) (Vernon 1998); *Bd.*

13

*of Adjustment v. Wende*, 92 S.W.3d 424, 432 (Tex. 2002). Courts "must attempt to give effect to every word and phrase if it is reasonable to do so." *Abrams v. Jones*, 35 S.W.3d 620, 625 (Tex. 2000). Several provisions within section 2301.476 refer to "franchised dealers." *E.g.*, Tex. Occ. Code Ann. § 2301.476(d), (f), (g). Were we to equate "dealer" with "franchised dealer" in section 2301.476, these references to franchised dealers would become superfluous.

International asserts that our construction of section 2301.476(c) creates a strange loophole. Section 2301.476(c) prohibits a manufacturer from owning, operating, or controlling an interest in a "dealer or dealership." In chapter 2301 of the Occupations Code, the term "dealership" means "the physical premises and business facilities on which a *franchised* dealer operates his business." Tex. Occ. Code Ann. § 2301.002(8) (emphasis added). Thus, the term "dealership" applies only to "franchised dealers," i.e., dealers of "new motor vehicles." *See id.* § 2301.002(16)(B). Because "dealer" does not apply to dealers of new vehicles only, section 2301.476(c)(1) apparently prohibits a manufacturer from owning an interest in a used car dealer, but not from owning an interest in that dealer's premises and business facilities.[8] Texas courts may consider the consequences of a

---

[8] We note this possible loophole only as part of our analysis of the term "dealer" and do not intend to enunciate a binding interpretation of section 2301.476(c)(1).

14

particular construction, Tex. Gov't Code Ann. 311.023(5) (Vernon 1998), and will not adhere to a literal interpretation that is "patently absurd." *City of Amarillo v. Martin*, 971 S.W.2d 426, 428 n.1 (Tex. 1998). Although our reading leaves a loophole, that reading is not patently absurd. Therefore, we may not depart from the meaning of "dealer" as defined by the statute.

International also argues that the legislative and statutory history of section 2301.476(c) indicates that it applies to new cars only. In particular, International emphasizes that section 2301.476(c)'s pre-1999 predecessor applied to dealers of new cars only. *See* Tex. Rev. Civ. Stat. Ann. art. 4413(36), §§ 1.03(15), 5.02(a), (b)(25) (Vernon Supp. 1999) (amended 1999). International argues that the 1999 Legislature never intended to change the meaning of these provisions. Under Texas principles of statutory interpretation, however, "prior law and legislative history cannot be used to alter or disregard the express terms of a code provision when its meaning is clear from the code when considered in its entirety." *Fleming Foods of Tex., Inc. v. Rylander*, 6 S.W.3d 278, 284 (Tex. 1999); *see also Logan v. State*, 89 S.W.3d 619, 627 (Tex. Crim. App. 2002). The Occupations Code clearly defines dealer, and we may not depart from that definition.

Therefore, the term "dealer" in section 2301.476(c) is not limited to dealers of new vehicles. Section 2301.476(c) bars

15

International from owning, operating, or acting as a dealer of used trucks.

## III.

We turn next to International's argument that if section 2301.476(c) bars International from acting as a dealer of used trucks, then that provision violates the dormant Commerce Clause, U.S. Const. art. I, § 8, cl. 3. The dormant Commerce Clause, also known as the negative Commerce Clause, prohibits states from engaging in economic protectionism. *See Dickerson v. Bailey*, 336 F.3d 388, 395 (5th Cir. 2003). International argues that section 2301.476(c) is the type of economic protectionism forbidden by the dormant Commerce Clause. The Director insists that section 2301.476(c) is legitimate economic regulation with only incidental and nondiscriminatory effects on commerce. We agree with the Director.

To evaluate whether a state statute comports with the dormant Commerce Clause, we begin by asking whether the statute impermissibly discriminates against interstate commerce or regulates evenhandedly with only incidental effects on interstate commerce. *Ford*, 264 F.3d at 499. If the statute impermissibly discriminates, then it is valid only if the state "can demonstrate, under rigorous scrutiny, that it has no other means to advance a legitimate local interest." *C & A Carbone, Inc. v. Town of Clarkstown, N.Y.*, 511 U.S. 383, 392 (1994). If the statute does

16

not impermissibly discriminate, then the statute is valid unless the burden imposed on interstate commerce is "clearly excessive" in relation to the putative local benefits. *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970).

A.

Section 2301.476(c) does not impermissibly discriminate against interstate commerce. In this context, discrimination means "differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Or. Waste Sys., Inc. v. Dep't of Envtl. Quality*, 511 U.S. 93, 99 (1994). A court may find discrimination based on evidence of discriminatory effect or discriminatory purpose. *Bacchus Imports, Ltd. v. Dias*, 468 U.S. 263, 270 (1984).

As *Ford* makes clear, however, discrimination does not include all instances in which a state law burdens some out-of-state interest while benefitting some in-state interest. 264 F.3d at 500; *see also Tex. Manufactured Hous. Ass'n v. City of Nederland*, 101 F.3d 1095, 1102 (5th Cir. 1996)("[T]he mere fact that a statute has the effect of benefitting a local industry while burdening a separate interstate industry does not in itself establish that the statute is discriminatory."). Rather, a state statute impermissibly discriminates "only when a [s]tate discriminates

17

among similarly situated in-state and out-of-state interests."
*Ford*, 264 F.3d at 500.[9]

Section 2301.476 does not discriminate between similarly situated in-state and out-of-state interests. In *Ford*, the plaintiff manufacturer failed to show that section 5.02C(c) was discriminatory in purpose or effect. 264 F.3d at 502. We found nothing in the legislative history to suggest that the Texas Legislature intended to discriminate between similarly situated interests. *Id.* at 500. Furthermore, we found no evidence of discriminatory effect. *Id.* at 500-02. Section 5.02C(c) did not discriminate against manufacturers based on out-of-state status; motor vehicle manufacturers, whether Texas-based or not, could not own, operate, control, or act as a dealer. *Id.* at 502. Nor did section 5.02C(c) discriminate against dealers based on out-of-state status; any non-manufacturer, whether Texas-based or not, could

---

[9] *Ford*'s understanding of discrimination rests squarely on *Exxon Corp. v. Governor of Maryland*, 437 U.S. 117 (1978), in which the Court evaluated a Maryland law that prohibited producers and refiners of petroleum products from operating retail service stations. The Court rejected Exxon's claim that, because Maryland had no in-state petroleum producers and refiners, the law discriminated against out-of-state interests. *Id.* at 125. That the law affected only out-of-state interests did not tend to prove impermissible discrimination. *Id.* at 125-26. The law at issue did not discriminate between in-state and out-of-state refiners or between in-state and out-of-state service stations. *Id.*

In contrast, the Court has found impermissible discrimination when a state statute discriminates between similarly-situated interests. *See, e.g.*, *Or. Waste*, 511 U.S. at 100 (discrimination between in-state and out-of-state waste); *Lewis v. BT Inv. Managers, Inc.*, 447 U.S. 27, 42 (1980) (discrimination among similarly-situated financial conglomerates according to their contacts with the state); *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 351-52 (1977) (benefit to in-state apple growers and dealers at the expense of out-of-state apple growers and dealers).

receive a dealer license.  *Id.*  This rationale applies with equal force to section 2301.476(c).

International characterizes *Ford*'s holding as a failure of summary judgment proof and claims that the improved summary judgment record in this case raises issues that the record in *Ford* did not.  Like Ford, however, International has failed to create any genuine question that Texas law impermissibly discriminates between similarly situated in-state and out-of-state interests.

First, International emphasizes that the practical effect of section 2301.476(c) falls primarily on out-of-state companies. That all or most affected businesses are located out-of-state does not tend to prove that a statute is discriminatory.  *See Exxon*, 437 U.S. at 126; *Ford*, 264 F.3d at 502.  Thus, the record that International has purportedly enhanced supports a proposition we have already dismissed as irrelevant.

International also relies heavily on an exception to section 2301.476(c) added by the Legislature in 1997.  *See* Act of May 22, 1997, ch. 639, § 36, 1997 Tex. Gen. Laws 2158, 2007.  That exception provides that a person who held both a motor home manufacturer's license and a motor home dealer's license on June 7, 1995,[10] may continue to hold both licenses and operate as a

---

[10]  June 7, 1995 was the day before the effective date of Texas's first ban on manufacturers operating as dealers.  *See* Act of June 8, 1995, ch. 357, §§ 2, 18, 1995 Tex. Gen. Laws 2887, 2889, 2900 (codified as amended at Tex. Rev. Civ. Stat. Ann. art. 4413(36), § 5.02(a), (b)(25) (Vernon Supp. 1999) (amended 1999)).

manufacturer and as a dealer of motor homes but of no other type of vehicle. Tex. Occ. Code Ann. § 2301.476(h) (formerly codified at Tex. Rev. Civ. Stat. Ann. art. 4413(36), § 5.02C(h) (Vernon Supp. 2002)). The legislative history suggests that a state legislator crafted this exemption to allow a particular manufacturer, located in his district, to continue acting as a dealer. *See, e.g.*, *Sen. State Affairs Comm. Subcomm. on Infrastructure: Senate Bill 1250*, 76th Leg., Reg. Sess. 42-43 (Tex. 1999) (statement of Sen. Nixon). This provision and its origins were before us in *Ford*, but International claims to have tendered new evidence showing that only one manufacturer--a Texas manufacturer--qualifies for the exemption.[11]

Neither the apparent purpose of 2301.476(h) nor its practical effect supports International's contention that this narrow grandfather clause is designed to benefit in-state manufacturers as a class at the expense of out-of-state manufacturers as a class. Section 2301.476(h) applies *only* to motor home manufacturers, and *only* to those motor home manufacturers who also held a dealer license on June 7, 1995. Thus, with respect to manufacturers who did not hold a dealer license on June 7, 1995, section 2301.476 does not discriminate. No such manufacturer, whether in-state or

---

[11] International repeatedly insists that section 2301.476(h) "facially" discriminates against out-of-state manufacturers. Section 2301.476(h), however, nowhere mentions Texas or out-of-state manufacturers. Therefore, we understand International to argue that the purportedly discriminatory effect of 2301.476(h) is evidence of its protectionist purpose.

out-of-state, can now qualify for a dealer license. With respect to manufacturers who did hold a dealer license on June 7, 1995, International might succeed in raising an inference of discrimination, albeit a weak one, if it could show that section 2301.476(h) exempted all Texas manufacturer-dealers but no out-of-state manufacturer-dealers. The record, however, does not even suggest that much. The record does not include a list of all manufacturers who held a dealer license on June 7, 1995. Hence, we cannot deduce that only a Texas manufacturer qualifies for the exception. Furthermore, at least one Texas manufacturer has previously acted as a dealer and therefore could potentially have held a dealer license on June 7, 1995, but still not qualify for section 2301.476(h) because it is not a manufacturer and dealer of motor homes. The burden of section 2301.476(c) could fall on both in-state and out-of-state manufacturers just as one would expect from a non-discriminatory statute.

B.

Because section 2301.476(c) is not discriminatory, we apply the *Pike* balancing test, which asks whether a challenged statute imposes a burden on interstate commerce that is "clearly excessive" in relation to the statute's putative local benefits. *See Pike*, 397 U.S. at 142. International has failed to demonstrate any burden, much less a burden clearly excessive in relation to the

21

state's legitimate interests. Therefore, section 2301.476(c) passes the *Pike* balancing test.

1.

International has not demonstrated any burden on interstate commerce. A statute imposes a burden when it inhibits the flow of goods interstate. *See Ford*, 264 F.3d at 503. In *Ford*, we found no evidence to suggest that section 5.02C(c) inhibited the flow of passenger vehicles interstate, *id.*, and International offers no credible reason why the situation would be different for medium- and heavy-duty trucks, whether new or used.

International seeks to establish a burden by claiming that closing its used truck centers will inhibit the flow of new medium- and heavy-duty trucks into Texas. According to International, its used truck centers drive up demand for new trucks by accepting trade-ins. Ending this practice, claims International, will suppress demand for new trucks and thereby reduce the supply of new trucks coming into Texas.

The fact that a regulation causes some business to shift from one supplier to another does not mean that the regulation burdens commerce; the dormant Commerce Clause "protects the interstate market, not particular interstate firms." *Exxon*, 437 U.S. at 127-28. Purchasers of medium- and heavy-duty trucks will simply turn to new trucks manufactured by International's competitors.

22

Even assuming that but for section 2301.476, International and its competitors could all stimulate demand for new trucks by accepting trade-ins, we would still find no burden actionable under the Commerce Clause.  The Supreme Court has "rejected the 'notion that the Commerce Clause protects the particular structure or methods of operation in a . . . market.'" *CTS Corp. v. Dynamics Corp. of Am.*, 481 U.S. 69, 93-94 (1987) (quoting *Exxon*, 437 U.S. at 127).  Whenever a state regulates competition in a market, that regulation may drive the market from its former equilibrium and thereby affect the quantity sold.  *See Ford*, 264 F.3d at 512 (Jones, J., concurring).  Such effects, however, speak to the wisdom of the statute, not to its constitutionality under the dormant Commerce Clause.  *Exxon*, 437 U.S. at 128.  Therefore, International has  failed to demonstrate any burden on interstate commerce.[12]

2.

---

[12] International seeks to avoid the implications of *Exxon* and *Ford* by differentiating the market for used medium- and heavy-duty trucks from the markets at issue in those cases.  In particular, International claims (1) that the market for used large trucks is a secondary rather than primary market; (2) that the market for used large trucks is primarily interstate rather than primarily intrastate; and (3) that unlike the used large truck market, the markets for passenger vehicles are dominated by a few large manufacturer-producers.  International catalogues these purported distinctions without providing any explanation of their relevance, and we perceive none. International also emphasizes that, unlike the markets for passenger vehicles and gasoline, the market for used large trucks involves products that are themselves instruments of interstate commerce.  This distinction is spurious, as it is hard to imagine products more closely tied to interstate commerce than passenger vehicles and gasoline.

Even if section 2301.476(c) created some minimal burden on interstate commerce, that burden would not be clearly excessive as compared to the putative local benefits. In assessing a statute's putative local benefits, we cannot "second-guess the empirical judgments of lawmakers concerning the utility of legislation." *CTS*, 481 U.S. at 92 (quoting *Kassel v. Consol. Freightways Corp.*, 450 U.S. 662, 679 (1981) (Brennan, J., concurring)). Rather, we credit a putative local benefit "so long as an examination of the evidence before or available to the lawmaker indicates that the regulation is not wholly irrational in light of its purposes." *Ford*, 264 F.3d at 504 (quoting *Kassel*, 450 U.S. at 680-81).

Thus, in *Ford*, we declared that Texas's purpose for passing section 2301.476(c)'s predecessor--"to prevent vertically integrated companies from taking advantage of their market position" and "to prevent frauds, unfair practices, discrimination, impositions, and other abuses of [its] citizens"--are legitimate state interests. *Ford*, 264 F.3d at 503 (quoting *Lewis*, 447 U.S. at 43). We also held that a reasonable legislator could have believed section 2301.476(c)'s predecessor would further those legitimate interests. *Id.* at 504. Although International maintains that the Legislature had no credible evidence to believe that manufacturers could use their disproportionate market power to the disadvantage of dealers, we may not now revisit *Ford*'s conclusion that the

Legislature did not act irrationally in banning manufacturer control of dealers.[13]

International, however, also focuses more specifically on whether section 2301.476(c) furthers this interest in the market for used trucks. According to International, its status as a manufacturer gives it no special leverage over dealers because, whereas manufacturers control the supply of new vehicles, they cannot control the supply of used vehicles. In our view, however, a reasonable legislator could easily have believed that a ban on manufacturers acting as dealers of used cars would further Texas's legitimate interests. The testimony heard by the Legislature in 1999 did not differentiate between dealers of new and used vehicles, so a legislator could reasonably have concluded that manufacturers could unfairly compete with dealers no matter what type of vehicles the dealer sold. *See generally Tex. Leg.'s House Comm. on Transp.: H.B. 3092*, 76th Leg., Reg. Sess.(Tex. 1999); *Sen. State Affairs Comm. Subcomm. on Infrastructure: Senate Bill 1250*, 76th Leg., Reg. Sess. (Tex. 1999); House Research Organization,

---

[13] Regardless, International mischaracterizes the legislative history. Before the Legislature passed section 2301.476(c)'s predecessor, committees in both chambers heard expert testimony that manufacturers enjoyed a great deal of leverage over dealers and could use that leverage unfairly. *See Tex. Leg.'s House Comm. on Transp.: H.B. 3092*, 76th Leg., Reg. Sess. 14-15, 21-22 (Tex. 1999) (statement of Mr. Gene Fondren, President, Tex. Auto. Dealers Ass'n); *Sen. State Affairs Comm. Subcomm. on Infrastructure: Senate Bill 1250*, 76th Leg., Reg. Sess. 57-61 (Tex. 1999) (statement of Mr. Gene Fondren). *See generally* House Research Organization, Bill Analysis of H.B. 3092, 76th Leg., Reg. Sess., at 4, 6 (Tex. 1999). This testimony came from a witness that International regards as biased, but we do not sit in judgment of the Legislature's determinations of credibility. *See CTS*, 481 U.S. at 92.

Bill Analysis of H.B. 3092, 76th Leg., Reg. Sess., at 4, 6 (Tex. 1999).

International's own operations confirm the reasonableness of this conclusion. According to International, its used truck centers are designed to help dealers of its new trucks by driving up demand. At oral argument, counsel for International described the relationship between the used truck centers and the new truck dealerships as "symbiotic." International may wield its power over dealers beneficently, but it no doubt wields power. Thus, a legislator could reasonably have believed that a ban on manufacturers acting as dealers of used cars would further Texas's legitimate interests. That reasonable belief is enough to confirm that section 2301.476(c) has at least putative local benefits.

Thus, International has failed to raise a genuine issue of material fact as to whether the burden on commerce supposedly created by section 2301.476(c) is clearly excessive in relation to the putative local benefit.

IV.

The district court correctly granted summary judgment to the Director. Section 2301.476(c) prohibits International from operating as a dealer of used trucks and does not violate the Commerce Clause.

AFFIRMED.